194 So.2d 351 (1966)
MOBIL OIL CORPORATION
v.
James H. GILL, Commissioner of Conservation of the State of Louisiana (J. M. Menefee, Commissioner of Conservation, Substituted Party Defendant).
No. 6792.
Court of Appeal of Louisiana, First Circuit.
November 21, 1966.
Writ Refused February 3, 1967.
Rehearing Denied December 28, 1966.
*352 Dixon Carroll of Simon, Carroll, Fitzgerald & Fraser, Shreveport, Roy M. Talley, Baton Rouge, R. T. Wilkinson, Jr., Roy L. Merrill, Houston, Tex., for appellant.
Rolfe H. McCollister, Baton Rouge, Robert Roberts, III, of Blanchard, Walker, O'Quin & Roberts, Shreveport, for appellee.
Before LANDRY, BAILES, and ELLIS, JJ.
ELLIS, Judge:
Plaintiff Mobil Oil Company brought this suit to have declared null and void certain portions of Department of Conservation Orders 397-B-10-a, 397-B-10-b, and 397-B-10-c, which relate to the allocation and distribution of the production from the Cadeville Sand of the Calhoun field. That portion of the orders complained of provides that 60% of the production or the proceeds thereof be distributed on the basis of the volume of productive sand underlying each tract, and 40% on the basis of the productive surface area overlying the sand. The order further designates a certain isopachous map, attached thereto as exhibit "B", as the basis for determining productive volume expressed in acre-feet, as well as productive surface acreage.
The original defendant in the case was James H. Gill, then Commissioner of Conservation, whose successor in office, J. M. Menefee, was later substituted as party defendant. Arkansas-Louisiana Gas Company intervened in support of the Commissioner.
After a full trial on the merits, judgment was rendered rejecting the demands of plaintiff. From that judgment, plaintiff prosecutes this appeal.
The Cadeville Sand underlies over 8000 acres of land in Ouachita, Lincoln and Jackson parishes. It is a lensatic type of structure, unbroken by faults, permitting free movement of gas and other hydrocarbons throughout the entire structure. The reservoir pressure was substantially equal throughout the sand, and the experts who testified felt that it could eventually be drained by only one well.
The field was discovered in 1959, and thereafter, twenty-five producing wells, in units of 320 acres per well, were drilled. Subsequently it was determined that normal production operations were causing a rapid drop in reservoir pressure, which, if allowed to go below a certain point, would cause retrograde condensation of the liquid hydrocarbons in the sand, making them unrecoverable. In February, 1962, the Commission of Conservation, under the emergency authority, ordered the wells producing from the Cadeville Sand shut-in in order to forestall any further pressure drop. Following a hearing held on March 14, 1962, order No. 397-B-10 was entered, which continued the shut-in status of the wells and ordered the operators to institute a program of cycling and pressure maintenance.
A cycling program consists in injecting dry gas into the formation through certain wells, which would have the effect of maintaining the formation pressure at a desirable level while wet gas was being extracted through certain other wells.
Such a program was instituted, and the Cadeville Sand was established as a single unit for cycling and pressure maintenance. Since, in such a program, some wells are used for injection, some for production and some are shut-in, the Commissioner has the authority and duty to establish the participation of the various owners and producers in the production from the reservoir.
*353 In this case, the Commissioner determined that the participation should be computed 60% on the basis of the productive acre-feet of sand underlying each unit, and 40% on the basis of productive surface acreage, and found that that formula "should establish an equitable distribution of the hydrocarbon production of the Cadeville Sand reservoir".
The foregoing is incorporated in findings 10 and 11 of Order 397-B-10-a, effective December 1, 1962. Finding 8 of the same order is to the effect that a certain isopachous map had been agreed on by the plaintiff herein, and a majority of the owners of interest in the reservoir as a reasonable representation of the productive area and geography of the Cadeville Sand. Finding 11(a) requires that it be used to determine the productive area and productive acre feet in the sand.
An isopachous map is one which represents the thickness of a formation by means of lines, similar to contour lines, drawn through points of equal thickness. Acre feet is a measure of volume of a stratum underlying a particular surface area arrived at by multiplying the area in acres by the thickness of the stratum in feet.
R.S. 30:9(D), which is conceded to be the basis for the Commissioner's allocation of proceeds in such a situation as this, reads as follows:
"Subject to the reasonable necessities for the prevention of waste, and to reasonable adjustment because of structural position, a producer's just and equitable share of the oil and gas in the pool, also referred to as a tract's just and equitable share, is that part of the authorized production of the pool, whether it be the total which could be produced without any restriction on the amount of production, or whether it be an amount less than that which the pool could produce if no restriction on amount were imposed, which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool, in so far as these amounts can be practically ascertained. To that end, the rules, regulations, and orders of the commissioner shall be such as will prevent or minimize reasonably avoidable net drainage from each developed area, that is, drainage not equalized by counter drainage, and will give to each producer the opportunity to use his just and equitable share of the reservoir energy. In determining each producer's just and equitable share of the production authorized for the pool, the commissioner is authorized to give due consideration to the productivity of the well or wells located thereon, as determined by flow tests, bottom hole pressure tests, or any practical method of testing wells and producing structures, and to consider other factors and geological and engineering tests and data as may be determined by the commissioner to be pertinent or relevant to ascertaining each producer's just and equitable share of the production and reservoir energy of the field or pool."
Appellants take the position that the only criterion that the Commissioner can legally use in establishing allocation of proceeds in the light of his findings and the language of R.S. 30:9(D) is the productive acre feet under the various units.
They base this contention on the testimony of the expert witnesses who stated that over 90% of the hydrocarbons in place in the formation could be recovered in a proper cycling program. It is argued that the recovery of this high percentage is to take place independent of any variations in such factors as well productivity, porosity, permeability and the presence of connate water in the formation. It is further argued that the equal distribution of hydrocarbons throughout the formation, and the fact that the isopachous map has been recognized by the Commissioner as "a reasonable representation of the productive area and geography of the Cadeville Sand", permits the most accurate computation of the *354 volume of hydrocarbons in place under each tract.
The position of the Commissioner, briefly, is that the isopachous map is not accurate because of the spacing of the wells, which are on 320 acre units, and therefore one mile apart East and West, and a half mile apart North and South, and that in determining "recoverable hydrocarbons" under each tract, factors other than productive acre-feet under the tracts must be considered.
The courts of this state have a right to review the orders of the Commissioner under R.S. 30:12, which provides as follows:
"An interested person adversely affected by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the commissioner hereunder, or by an act done or threatened thereunder, and who has exhausted his administrative remedy, may obtain court review and seek relief by a suit for an injunction against the commissioner as defendant. Suit shall be instituted in the district court of the parish in which the principal office of the commissioner is located and shall be tried summarily. The attorney representing the commissioner may have a case set for trial at any time after ten days' notice to the plaintiff or his attorney of record. The burden of proof shall be upon the plaintiff and all pertinent evidence with respect to the validity and reasonableness of the order of the commissioner complained of shall be admissible. The law, the provision of this Chapter, or the rule, regulation, or order complained of, shall be taken as prima facie valid. This presumption shall not be overcome in connection with any application for injunctive relief, including a temporary restraining order, by verified petition or affidavit of or in behalf of the applicant. The right of review accorded by this Section shall be inclusive of all other remedies but the right of appeal shall lie as hereinafter set forth in this Chapter."
Appellees contend that under the law of this state, the courts are limited to the determination of whether or not the Commissioner's order is supported by substantial evidence. However, R.S. 30:12 makes it clear that the courts have the duty of determining the validity and reasonableness of the order, and declares that all pertinent evidence relative thereto "shall be admissible". The courts are, therefore, obligated to give a full review to the facts of the particular case. However, it is also the law of this state that the courts will not substitute their discretion or judgment for that of the Commissioner in the absence of evidence showing such action to be arbitrary. Hunter Co. v. McHugh, 202 La. 97, 11 So.2d 495 (1942); O'Meara v. Union Oil Co., 212 La. 745, 33 So.2d 508 (1947); Monsanto Chemical Co. v. Hussey, 234 La. 1058, 102 So.2d 455 (1958).
R.S. 30:12 places the burden of proof in such cases on the plaintiff. It is plaintiff's position that under the provisions of R.S. 30:9(D) the "just and equitable share" of any producer in a cycling unit must be determined on a volumetric basis as a matter of law. The language of R.S. 30:9 (D) makes it clear that the Commissioner has the right to consider other factors in making his determination:
"In determining each producer's just and equitable share of the production authorized for the pool, the commissioner is authorized to give due consideration to the productivity of the well or wells located thereon, as determined by flow tests, bottom hole pressure tests, or any other practical method of testing wells and producing structures and to consider other factors and geological and engineering tests and data as may be determined by the commissioner to be pertinent or relevant to ascertaining each producer's just and equitable share of the production *355 and reservoir energy of the field or pool."
The record in this case is voluminous. As is usual in such cases, virtually all of the testimony is by experts, all of whom were highly qualified as geologists, petroleum engineers, and in the field of reservoir mechanics. Little would be achieved by reviewing the testimony in detail of these witnesses. Suffice it to say that the experts who testified for plaintiff were of the opinion that in this case the productive acre feet under each tract had been practically ascertained and was represented by the isopachous map above referred to, and that, in this case, factors such as well productivity, porosity, permeability and connate water would not have to be taken into account because there was no significant difference in these across the reservoir, and because of the manner in which the hydrocarbons are to be produced from the sand.
The experts who testified for appellees, on the other hand, felt that there was an inherent inaccuracy in the isopachous map, because of the distance between wells in the reservoir, and indicated that some factor other than acre feet would have to be introduced in order to make the participation formula "just and equitable". Although none of these men were able to furnish any scientific or mathematical basis for basing tract participation 40% on productive surface acreage, they felt that this was a reasonable solution to the problem.
As stated by the trial Judge in his exhaustive and well reasoned opinion:
"Where experts disagree, where proven facts show the existence of many variables, where reaching a fair balance involves incalcuable variants, the court cannot conclude that the Commissioner of Conservation acted arbitrarily and capriciously, but rather giving the presumption of validity its effect, this court concludes that the Commissioner of Conservation acted reasonably and in accordance with the law, that the findings and order made in support thereof do not deprive the plaintiff of due process, and Order 397-B-10-a is a valid and enforceable order. * * *"
The judgment of the trial court is, accordingly, affirmed.