Laurest J. TRAHAN, et al., Plaintiffs-Appellants Cross-Appellees,

v.

SUPERIOR OIL COMPANY, et al., Defendants-Appellees Cross-Appellants.

No. 81–3081.

United States Court of Appeals, Fifth Circuit.

March 21, 1983.

Raymond A. Beyt, Bernard E. Beyt, La-fayette, La., for Laurest J. Trahan et al.

Liskow & Lewis, Lawrence P. Simon, Jr., Robert T. Jorden, Lafayette, La., for Superior Oil Co.

Gordon, Arata & McCollam, John M. McCollam, New Orleans, La., for all other defendants.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this Louisiana law diversity case, plaintiffs Trahan, et al. appeal from a judgment dismissing their suit for cancellation of a mineral lease based on the alleged failure of the defendant lessee to prevent drainage of plaintiffs' land from a well drilled by the defendant on a nearby tract. The district court held that plaintiffs' suit was based solely on the theory that, as a result of defendant's failure to fairly present information in its possession at the hearings before the Louisiana Conservation Commissioner concerning the appropriate unit for the offending well, the Commissioner's orders fixing the unit failed to include any of plaintiffs' land, and that accordingly the suit constituted a collateral attack on the Commissioner's orders which, in the absence of an allegation of fraud, was impermissible under Louisiana law. We agree and affirm the district court's judgment.

I.

*Analysis of the Trahans' Suit*

Appellants [1] (the "Trahans") alleged that in February 1972 they granted appellees [2] ("Superior") an oil and gas lease on a 70-acre tract of their land in Vermilion Parish, Louisiana. No other land was included in this lease. In July 1973, Superior, as lessee in an oil and gas lease of the 81-acre Dartez tract lying immediately to the west of and adjacent to the Trahan tract, commenced drilling the E. Dartez Well No. 1 (the "Dartez Well") at a location on the Dartez tract some 330 feet west of the west line of the Trahan tract. The Trahans owned no interest in the Dartez tract. In March 1974, Superior applied to the Louisiana Conservation Commissioner for permission to make a selective completion of the Dartez Well as a gas well in the Miogyp Sand and in the Camerina 1 Sand ("Camerina Sand"). The Commissioner granted the application, and in July 1974, the well was completed, but only in the Miogyp Sand. Superior then applied to the Commissioner for a unit surrounding the Dartez Well, and in January 1975, the Commissioner issued an order establishing a 1,321-acre production unit

---

1. Laurest J. Trahan, Presley Trahan, and Evelyn T. Vincent.

2. The Superior Oil Company, Pel-Tex Oil Company, Inc., Patrick Petroleum Corporation of Michigan, Hanover Petroleum Corporation, Earl P. Burke, Jr., Pelmont International, Inc., Burmont Company, Kenneth G. McCann, Jr., and Kildee Limited.

around the well for production from the Miogyp Sand. This unit (the "Miogyp Unit") included all of the Trahans' land. The Trahans make no complaint of the Miogyp Unit. The Miogyp Unit has continued in effect, and Superior has continued to produce the Dartez Well from, but only from, the Miogyp Sand.

The Trahans assert that the data submitted by Superior in support of its selective completion application for the Dartez Well reflected that it "was capable of producing in the Camerina 1 Sand."

In November 1976, Superior completed its W.J. Greene Well No. 1 (the "Greene Well") on a tract on which it held an oil and gas lease "located in the Northwest Quarter of Section 23" and "in close proximity to" the Trahans' 70-acre tract. The Trahans owned no interest in this Greene tract.[3]

Superior then applied to the Commissioner "for a hearing to establish a production unit for" the Greene Well and requested a 717-acre unit, "on a geographical basis." On January 17, 1977, the Commissioner, following a hearing, issued an order establishing the 717 acres around the Greene Well as a unit for production from the Camerina Sand as requested by Superior. This unit (the "Camerina Unit") included four acres of the Dartez tract as well as lands in Sections 23 and 22, but none of the Trahan tract.

Later in 1977, Superior completed the B.T. Broussard Well No. 1 (the "Broussard Well") as a gas well in the Camerina Sand on a leasehold owned by it in Section 22 and within the surface outlines of the Camerina Unit.[4] The Trahans owned no interest in the lands covered by this lease. Superior applied to the Commissioner "for a hearing requesting the continuation of the 717 acre unit [the Camerina Unit] with the B.T. Broussard Well No. 1 being classified as an alternative well." On January 16, 1978, following a hearing, the Commissioner ordered the Broussard Well classified as an alternative well in the Camerina Unit. The Trahans then allege that "thereafter, with full knowledge that drainage of [the Trahans'] land was occurring" Superior applied to the Commissioner "for a hearing to increase the surface outlines of the Camerina 1 Sand reservoir to the prejudice of" the Trahans. It is further alleged that "[h]owever, the Louisiana Department of Conservation issued Order 557–E–2 dated May 1, 1978, effective March 14, 1978, creating two units for the Camerina 1 Sand reservoir," each unit being approximately 681 acres; one unit being for the Greene Well and including approximately 14 acres of the Trahan tract, and the other unit being for the Broussard Well and apparently including none of the Trahan tract.

The Trahans make no complaint of this May 1, 1978 order, neither on account of not more of their land being included in the unit for the Greene Well, nor for the failure to include any of their land in the unit for the Broussard Well, nor for any other reason. Nor do the Trahans allege any drainage from their land as a result of production from the Broussard Well, or any well other than the Greene Well.

The Trahans' sole complaint is of drainage in the Camerina Sand from the Greene Well during the period from November 1976, when that well went on production,

---

**3.** From the plat attached to the Trahans' pleadings, it appears that the Greene tract does not adjoin the Trahans' land. The Trahan tract is in the middle, and at the western line, of the west half of Section 13, the Trahan tract south line being some 1,400 feet north of the south line of Section 13. The Dartez tract is in the east half of Section 14, the east line of which constitutes the west line of Section 13. The south line of Section 14 also forms the north line of Section 23, while the south line of Section 13 is the north line of Section 22, which lies immediately to the east of Section 23. The northeast corner of the northwest quarter of Section 23 (in which the Greene Well was located) is some 1,400 feet south and 2,600 feet west of the southwest corner of the Trahan tract.

**4.** Section 22 is immediately south of Section 13, in which the Trahan tract is located, but does not adjoin the Trahan tract. Section 23, in the northwest quarter of which the Greene Well is located, lies immediately to the west of Section 22. Section 14, on which the Dartez Well is located, is just north of Section 23 and west of Section 13. *See* note 3, *supra.*

until March 14, 1978, the effective date of the Commissioner's May 1, 1978 order placing 14 acres of the Trahan tract in the Camerina Sand production unit for the Greene Well. It is alleged that during this time the Greene Well produced from the Camerina Sand "an excess of seven times more than the production" of the Dartez Well from the Miogyp Sand. There is no allegation that Superior should have drilled any offset well (or made an additional completion of any existing well) on the Trahan tract to prevent or alleviate this drainage.[5] The only basis on which the Trahans seek to hold Superior responsible for the complained of drainage during this period from the Greene Well is reflected in the following allegations of their pleadings:

"10.

" . . . That despite the geological and engineering information in their possession obtained from the E. Dartez Well No. 1 demonstrating the existence of the Camerina 1 Sand underlying the lands of petitioners [the Trahans], defendants [Superior] failed to fairly present at said hearing [the original unit hearing for the Greene Well] this information in breach of their obligation to protect petitioners' [the Trahans'] land from drainage. That as a

result of said defendants' [Superior's] failure to fairly present this information in their possession, defendants' [Superior's] request for a 717 acre production unit was granted . . . January 17, 1977, on a geographical basis, which Production Unit included only approximately four acres of the Dartez tract and none of petitioners' [the Trahans'].

" . . .

"12.

"That during the period from November 1976, to March 1978 and the issuance [May 1, 1978, effective March 14, 1978] of Order No. 557–E–2 as hereinafter alleged, the W.J. Greene Well No. 1 was draining the property of petitioners [the Trahans] as a result of said defendants' [Superior's] failure to fairly present to the Louisiana Department of Conservation all geological and engineering information in their possession. . . .

" . . .

"14.

" . . . Despite the geological and engineering information in their possession obtained from the E. Dartez Well No. 1 demonstrating the existence of the Cam-

---

**5.** The Trahans also alleged that "the production by said defendants [Superior] of the E. Dartez Well No. 1 from November 1976, to March 1978 [the effective date of the inclusion of the 14 acres of the Trahan land in the Camerina Sand production unit for the Greene Well], solely from the Miogyp Sand despite the known existence of the Camerina 1 Sand . . . is not consistent with the exercise of reasonable diligence in the operation and production of petitioners' [the Trahans'] lease." In our view, this allegation adds nothing to the Trahans' suit, and they do not rely on it on appeal. Production of the Dartez Well from the Miogyp Sand did not harm the Trahans since they at all times shared in this production on a basis of which they make no complaint. Since the Dartez Well was not on the Trahans' land, if it had produced from the Camerina Sand it would not have helped the Trahans, unless there were a Camerina Sand unit applicable to the well which included the Trahans' land. However, the only allegations which the Trahans make with respect to any failure to have any of their land included in a Camerina Sand unit are directed to the hearing for the initial unit on the Greene Well, which was completed in Novem-

ber 1976, resulting in the order of January 17, 1977 creating the Camerina Unit, and the initial unit hearing respecting the Broussard Well, resulting in the January 16, 1978 order continuing the previously established Camerina Unit. There is no complaint of drainage from any well other than the Greene Well, nor is there any complaint of failure to produce the Dartez Well from the Camerina Sand before November 1976 or after March 1978, nor is there any allegation that Superior should have applied for any unit at any *time* other than when it did so, or that it should have applied for a Camerina Sand unit on the Dartez Well.

Similarly, the Trahans' allegations that the initial Miogyp Unit was "substantially smaller" than requested by Superior, and that in its application following the January 1978 order Superior requested an increase in the surface outline of the Camerina Sand reservoir "to the prejudice of" the Trahans, do not add anything to the cause of action sought to be alleged, because there is no complaint of the resulting units or other allegations of resulting damage in regard to these requests by Superior.

erina 1 Sand underlying the lands of petitioners [the Trahans], defendants [Superior] again failed to fairly present at said hearing [the initial unit hearing for the Broussard Well] this information in breach of their obligation to protect petitioners' [the Trahans'] land from drainage. That as a result of defendants' [Superior's] continued failure to fairly present this information in their possession, defendants' [Superior's] request was granted under Order [of the Commissioner] ... dated January 16, 1978, classifying the B.T. Broussard Well No. 1 as an alternative well in the 717 acre Camerina 1 Sand unit for the W.J. Greene Well No. 1.

" . . .

"18.

" . . . [T]he intentional failure [of Superior] to protect petitioners' [the Trahans'] approximate 14 acres from drainage in the Camerina 1 Sand by failing to fairly present to the Louisiana Department of Conservation all geological and engineering information in their [Superior's] possession, is not consistent with the exercise of diligence in the operation and production of petitioners' [the Trahans'] lease. . . .

"19.

" . . . [S]aid defendants [Superior] occupy the position of being the lessees of the drained premises as well as being the lessees and operators of the draining well and, therefore, were not required to spend additional money in the drilling of an offset well . . . .

" . . .

"22.

" . . . [S]aid defendant could have prevented the drainage without sustaining any economic loss by fairly presenting to the Louisiana Department of Conservation all geological and engineering infor-

mation in their possession at the hearings [on the basis of which the Commissioner's January 17, 1977 and January 16, 1978 orders were issued] for the units created around the W.J. Greene Well No. 1 . . . . "

"23.

"Petitioners [the Trahans], therefore, are entitled to a cancellation of the lease held by said defendants [Superior] because of the lack of reasonable diligence in their failure to prevent the drainage occurring from under the petitioners' [the Trahans'] lands."

There is no express allegation of any fraud, lack of good faith, or intentional deception.

The Trahans alleged they had made written demand on Superior "for compensation for said drainage, which has occurred" and, since they were not paid within thirty days, were entitled to cancellation of the lease or, alternatively, "damages in the amount of double the royalty due."[6] The suit was originally filed in state court in July 1979, and was removed by Superior on grounds of diversity. Thereafter, and following the filing of the Trahans' "Second Amending Petition," Superior moved to dismiss the suit for failure to state a claim, on the grounds that its allegations "constitute a collateral attack upon an Order or Orders of the [Louisiana] Commissioner of Conservation." In a supporting memorandum, Superior relied on the cases of *Savoy v. Tidewater Oil Company,* 218 F.Supp. 607 (W.D. La.1963), *aff'd per curiam,* 326 F.2d 757 (5th Cir.1964), and *Mayer v. Tidewater Oil Company,* 218 F.Supp. 611 (W.D.La.1963), and pointed out that the Trahans made "no showing or allegation of fraud or collusion." The Trahans then filed their "Third Amending Petition," their final pleading below, from which the above set out quotations are taken, and a memorandum in opposition to Superior's motion to dismiss. In this memorandum, the Trahans did not take

6. They also sought their attorneys' fees in the   suit. No other relief was sought.

the position that they had alleged any fraud or collusion.[7]

The district court granted Superior's motion to dismiss, holding that under Louisiana law the Trahans' suit constituted an impermissible collateral attack on the Commissioner's orders. The court below also expressly ruled that the Trahans had not alleged fraud on the part of Superior, either by using the word "fraud" or by alleging that Superior intentionally misled the Commissioner through misrepresentation, suppression, or withholding of the true facts.[8] We agree with the district court's construction of the Trahans' pleadings in this respect. Fraud and the circumstances alleged to constitute it must be "stated with particularity." Fed.R.Civ.P. 9(b). The Trahans' pleading under consideration was filed after

a motion to dismiss and a supporting memorandum expressly noting the failure to allege fraud or collusion. The authorities dealing with the collateral attack issue and the possible relevance of fraud in that connection were fully briefed by the parties before the district court. Although the district court expressly based its judgment on a failure to allege fraud or intentional misleading, the Trahans did not seek leave to further amend their pleading in this respect, and they made no complaint to the district court of the construction which it had placed on their pleadings. Nor do they make any such complaint in their brief on appeal.[9] Therefore, we also proceed on the assumption that the Trahans have not charged Superior with fraud, bad faith, or the withholding of information with intent to deceive.[10]

7. Superior thereafter renewed its motion to dismiss on the same ground, and both parties filed further memoranda. However, there was no change in the respective theories of the parties.

8. The district court's opinion states that fraud would consist of "intentional misrepresentation or intentional suppression of the truth; intentional withholding of information designed to mislead" and that the Trahans had not alleged that Superior "intentionally misrepresented or suppressed the true facts and misled the Commissioner." The court was also of the view that if such allegations had been made, the Trahans' suit would *not* be barred by the collateral attack doctrine.

9. This position was likewise maintained at oral argument before this Court. The transcript of the oral argument reflects the following statements by the Trahans' capable counsel:

"... We have not alleged fraud. As you well know, it's very hard to prove fraud in a company situation where you have very many people that make decisions. What we're looking to is the basic mineral lessee's obligation under the Louisiana Mineral Code to act as a prudent operator.

"[Question from the Bench.] You have not alleged fraud, is that correct?

"Right—well, only in the sense that—that what may be taken as fraud as close as—Let me put it this way, as close as possible without maybe the restrictions of proving that, because I think we are looking at a practical situation that if we do get to the lower court and try our case we're going to be faced with the situation that's going to turn on what a prudent operator did under those situations and whether a mineral lessee in Superior and the remaining defendants' position would

have presented the information in their possession.

"...

"[Question from the Bench.] Is it just negligence? In other words, Superior knows that it's got this information—

"Right—

"[Question from the Bench.]—decides not to present it, but does not make that decision with fraudulent intent, rather makes it negligently?

"Right.

"[Question from the Bench.]—I take it this is what you're saying, isn't it?

"Right, because what we're going back—

"[Question from the Bench.] All right. And so that negligence of theirs is what—is the foundation of your cause of action.

"Right. And under the Louisiana Mineral Code we call that a prudent operator, that's it exactly. And I'll reserve some time there. Thank you."

10. And we accordingly construe the language in paragraph 18 of the Trahans' "Third Amending Petition," as quoted earlier in the text, as intending only what it literally says, namely, that Superior intentionally failed to protect against drainage; that is, that it was aware it was doing nothing to protect against drainage, rather than that its failure to fairly present to the Commissioner the information in its possession concerning the Dartez Well was motivated or accompanied by an intention to mislead or deceive the Commissioner (or anyone else) as to the true facts, or was the product of anything worse than negligence or an absence of prudence. We also observe that although the Trahans allege that since the drilling of the Dartez Well "defendants [Superior] were fully

The only occasions on which it was alleged that Superior failed to fairly present information to the Commissioner are the two hearings leading, respectively, to the January 17, 1977 order fixing the Camerina Unit for the Greene Well and to the January 16, 1978 order continuing this unit with the Broussard Well as an alternate well. The *only* information allegedly not fairly presented to the Commissioner at these two hearings is "the geological and engineering information in their [Superior's] possession obtained from the E. Dartez Well No. 1 demonstrating the existence of the Camerina 1 Sand underlying the lands of petitioners [the Trahans]." The Trahans also alleged that, in its 1974 application for a selective completion of the Dartez Well, Superior presented to the Commissioner certain documents, including electric logs of the well, copies of which are attached to the Trahans' pleadings. These documents *purport* to show, and the Trahans affirmatively allege that they do in fact indicate, that the Dartez Well "was capable of producing in the Camerina 1 Sand." The Trahans allege that in 1974 the Commissioner granted the application and authorized selective completion of the Dartez Well in the Camerina Sand and in the Miogyp Sand. The Trahans do not allege that any of the data so submitted by Superior in 1974 was inaccurate, incomplete, or misleading. Nor do they allege that Superior obtained any information from the Dartez Well concerning the Camerina Sand other than that which they presented to the Commissioner in connection with the selective completion application on the Dartez Well. There is no allegation that the information filed by Superior with the Commissioner in reference to the Dartez Well selective completion application was not still on file, or was unavailable or unknown to the Commissioner, at the time of the hearings leading to the complained of January 1977 and January 1978 orders respecting the Camerina Sand unit.

We further observe that there is no allegation that the Trahans did not have notice of, or did not attend, the Commissioner's hearings for these January 1977 and January 1978 orders respecting the Camerina Sand unit.[11] Nor do the Trahans allege that they were unaware that Superior had applied for a unit on the Greene Well which did not include their land (either initially after that well was completed or after the Broussard Well was completed), or that Superior did anything to lead them to believe that Superior would not request an original or continued Camerina Sand unit that did not include their land. The Trahans do not allege that they failed to take any action before the Commissioner in reliance on anything Superior did or said (indeed the Trahans do not allege that they failed to do

aware at all times of its capabilities of producing from the Camerina 1 Sand," the only allegation that Superior knew of drainage of the Trahans' property in that sand was at the time of the application to increase the surface outlines of the Camerina Sand which led to the Commissioner's May 1, 1978 order, effective March 14, 1978, including 14 acres of the Trahan tract in the Camerina Sand production unit for the Greene Well. Finally, not only do the Trahans' pleadings contain no express allegation of fraud, bad faith, or deceptive intent, but the derelictions charged against Superior are all ultimately alleged only in terms of being inconsistent with "the exercise of reasonable diligence," or operating "other than reasonable and prudent operators," or "lack of reasonable diligence." *See also* note 9 *supra.*

**11.** At oral argument before this Court, counsel for the Trahans stated:

"... Subsequent to that the defendants thereafter drilled the Greene Well, also in close proximity to plaintiffs' property, and completed that well in the Camerina 1 Sand. The defendants then applied to the Department of Conservation for a unit for that well. "[Question from the Bench.] Did you have notice of that application?

"Yes, sir. The uh—all the landowners in the area, this is in the Kaplan Field in Vermilion Parish, which is quite an extensive area, were given notice of the uh—of the uh—application.

"[Question from the Bench.] Were you present at the preapplication conference or the application hearing, either one?

"I was not personally—

"[Question from the Bench.] I don't mean you personally, but I mean your clients or someone on their behalf.

"I really can't answer that. I assume that they would be though."

anything before the Commissioner), or that Superior undertook to represent their interests before the Commissioner. And, they do not claim that Superior misled them in any way.[12]

The sole basis, then, of the Trahans' complaint is that Superior "failed to fairly present," at the public hearings before the Commissioner for his January 1977 and January 1978 orders fixing the Camerina Unit for Superior's Greene and Broussard Wells, geological and engineering information in Superior's possession which it had obtained, and presumably furnished the Commissioner, in 1974 from its Dartez Well indicating that such well was capable of producing from the Camerina Sand. Although Superior's claimed failure to fairly present that information at those two hearings is alleged to have amounted to a lack of reasonable diligence and prudent operation in its position as the Trahans' lessee, there is no assertion that such failure was fraudulent, in bad faith, or intentionally deceptive as respects either the Commissioner or the Trahans. The only allegation of an adverse consequence to the Trahans resulting from such dereliction on Superior's part is that had Superior fairly presented such information at those hearings, then the January 1977 and January 1978 orders which the Commissioner would have entered would have been different from those he actually did enter on such occasions, and, unlike the orders actually entered, would have included some of the Trahans' land in the Camerina Sand unit, and that accordingly the Trahans would not have suffered uncompensated drainage from their land by the Greene Well before March 1978. The only relief sought is cancellation of the lease, or damages, on account of that drainage. The question presented is whether, under Louisiana law, such a suit constitutes an impermissible collateral attack on the Commissioner's January 1977 and January 1978 or-

ders. We agree with the district court that it does.

## II.

### Overview of Louisiana Oil and Gas Regulatory Scheme

Louisiana has long had a comprehensive scheme for the administrative regulation of oil and gas development and production by the Louisiana Department of Conservation, under the direction and control of the Commissioner of Conservation. LSA–R.S., Title 30, Chapter 1. The Commissioner has extensive investigatory, regulatory, and rule-making authority, and is, among other things, empowered to grant permits for the drilling and production of wells, to fix well locations and allowables, to regulate the spacing of wells, and to require reporting respecting drilling and production. *See* LSA–R.S. 30:4, 7, 9, 10, and 11.

For the purpose of preventing waste and "to avoid the drilling of unnecessary wells," the Commissioner is directed to establish drilling units, defined as "the maximum area which may be efficiently and economically drained by one well," for each "pool" or common reservoir. LSA–R.S. 30:9 B. The unit well shall be located at "the optimum position in the unit" "for the most efficient and economic drainage of such unit," but not so as to allow production of more than the just and equitable share of oil and gas in the pool. LSA–R.S. 30:9 B. No order shall be made which either will require the producer from, or owner of, a given tract in the pool, in order to obtain the tract's just and equitable share of the production from the pool, to drill any well on that tract in addition to any well that could produce such share without waste, or will occasion net uncompensated drainage. LSA–R.S. 30:9 A. A tract's just and equitable share is the proportion of authorized production from the pool equal to the pro-

---

12. And, the Trahans do not assert that they were unaware that the Dartez Well was capable of producing from the Camerina Sand, or that Superior had applied for a selective completion of the Dartez Well including that sand, or that the Commissioner had authorized its completion in the Camerina Sand. They do not claim that Superior failed to inform them of any of these matters, or of the drainage from the Greene Well, or that they were in fact unaware of such drainage.

portion which the quantity of recoverable oil and gas in the segment of the pool underlying the tract bears to the quantity of recoverable oil and gas in the entire pool. LSA–R.S. 30:9 D. If two or more separately owned tracts are included within a drilling unit, and "the owners have not agreed to pool their interests, the commissioner shall require them to do so . . . if he finds it to be necessary to prevent waste or to avoid drilling unnecessary wells." The pooling order will be on just and reasonable terms and conditions, allowing each tract owner to receive his just and equitable share of the oil and gas in the pool without unnecessary expense and to avoid uncompensated drainage.[13] The production allocated by the pooling order to each tract in the drilling unit "shall, when produced be considered as if it had been produced from his tract by a well drilled thereon." LSA–R.S. 30:10.[14]

No rule, order, or regulation shall be adopted by the Commissioner except after a public hearing upon due notice.[15] When application is made for an order fixing or revising any oil or gas production unit, the public hearing must be on at least thirty days' notice, and the applicant is required to file two plats of the proposed unit, which are to be kept open for public inspection during such thirty days in the Commission-er's offices, one in Baton Rouge and the other in the conservation district where the property is located. The hearing is to be conducted by the Commissioner or, at his designation, by a member of his staff who is an attorney, engineer, or geologist. "Any person having an interest in the subject matter of the hearing shall be entitled to be heard." LSA–R.S. 30:6 B. The Commissioner has subpoena power, and testimony is given under penalties of perjury. LSA–R.S. 30:8.[16] In determining a unit, the Commissioner "shall consider all available geological and engineering evidence." LSA–R.S. 30:9 C. Within thirty days after its entry, the Commissioner is required to file each order creating or amending any drilling or production unit in the conveyance records of the parish or parishes in which the land is located. LSA–R.S. 30:11.-1.

"Any interested person" has the right, by written request, to require the Commissioner to "promptly hold a hearing" for "taking action in respect to a matter within the jurisdiction of the commissioner." If the Commissioner does not issue an order on the subject matter within thirty days after the conclusion of the hearing, "he may be compelled to do so by mandamus at the suit of any interested person." LSA–R.S. 30:6 F.[17]

---

**13.** Provision is also made for actual reasonable expenditures of pool development and operation to be ratably chargeable by the operator to the other interested owners. LSA–R.S. 30:10 A(1)(c). When pooling is ordered on application of a nondrilling lessee, the applicant may be required to advance his share of the costs in cash, rather than to simply have such costs charged to his share of production. *Superior Oil Co. v. Humble Oil & Ref. Co.,* 165 So.2d 905 (La.App. 4th Cir.), *writ ref'd,* 246 La. 842, 167 So.2d 668 (1964) (court of appeals judgment "not final").

**14.** The foregoing is intended merely as a generalized summary of the principal provisions of LSA–R.S. 30:9 and 10, and, among other things, does not purport to encompass all the details of those provisions or the various exceptions and qualifications thereto, none of which are relevant for present purposes.

**15.** The Commissioner is also given authority to prescribe procedural rules respecting hearings. LSA–R.S. 30:6 A and 6 B. These rules must be in writing and open to public inspection at all reasonable times. LSA–R.S. 30:6 E.

**16.** And, the making or filing of false reports to the Commissioner, or the making of false entries, or the omission of full, true, and correct entries, in records required to be kept pursuant to rule or regulation of the Commissioner, is a criminal offense. LSA–R.S. 30:17. Knowing and willful violations of the conservation laws, or orders, rules, or regulations of the Commissioner, are subject to civil penalty of up to $1,000 per day or violation, recoverable at the suit of the Commissioner. LSA–R.S. 30:18.

**17.** It is further provided that the Commissioner may bring suit to enjoin actual or threatened violations of the conservation laws or of any of his rules or regulations, LSA–R.S. 30:14, but that if he fails to do so within ten days of the written notification of the violation and request for suit by "any person in interest adversely affected by the violation," then such person may bring such a suit, and, if the court finds an injunction is proper, the Commissioner will be made a party. LSA–R.S. 30:16.

The procedure afforded for judicial challenge to, or relief from, orders, rules, or regulations of the Commissioner is set out in LSA–R.S. 30:12 as follows:

"An interested person adversely affected by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the commissioner hereunder, or by an act done or threatened thereunder, and who has exhausted his administrative remedy, may obtain court review and seek relief by a suit for an injunction against the commissioner as defendant. Suit shall be instituted in the district court of the parish in which the principal office of the commissioner is located .... The burden of proof shall be upon the plaintiff and all pertinent evidence with respect to the validity and reasonableness of the order of the commissioner complained of shall be admissible. The law, the provision of this Chapter, or the rule, regulation, or order complained of, shall be taken as prima facie valid.... The right of review accorded by this Section shall be inclusive of all other remedies, but the right of appeal shall lie as hereinafter set forth in this Chapter." [18]

In suits under section 12, the court, in determining the validity of the challenged order, is not limited to a consideration of the evidence before the Commissioner, for the statute declares that "all pertinent evidence with respect to the validity and reasonableness of the order ... shall be admissible," and the courts are hence "obligated to give a full review to the facts of the particular case." While the substantial evidence rule is inapplicable, the courts will not substitute their judgment for that of the Commissioner, and the plaintiff has the burden of proof to show that the complained of order was arbitrary. *Mobil Oil Corporation v. Gill,* 194 So.2d 351, 354 (La.App. 1st Cir.1966), *writ denied,* 250 La. 174, 194 So.2d 738 (1967). *See also Jordan v. Sutton,* 401 So.2d 389, 392–93

(La.App. 1st Cir.1981). There is no fixed period of time following the entry of the order within which a suit attacking it under section 12 must be filed. Rather, such a suit will be time barred only if the defendant establishes both that there was unreasonable delay on the part of the plaintiff in bringing the suit, and that the defendant, or a third person, would suffer harm as a result of action taken based on the reasonable assumption, occasioned by the delay, that plaintiff would not sue to challenge the order. This depends on the facts of each particular case, including the information available to the plaintiff. *Jordan,* 401 So.2d at 393–94. If proper notice of hearing before the Commissioner is not given, the Commissioner's order will be set aside in a suit under section 12 by a party at interest who did not have adequate actual notice. *See Brown v. Sutton,* 356 So.2d 965 (La.1978).

### III.

### *The Rule Precluding Collateral Attack on Orders of the Louisiana Conservation Commissioner*

Louisiana decisions clearly reflect the principle that suit under section 12 is the exclusive means by which an order of the Commissioner may be called into question in a judicial proceeding. The application of this rule prohibiting "collateral attack" of an order of the Commissioner is not limited to suits in which the judgment will directly affect actual enforcement of, or compliance with, the Commissioner's order, such as suits by or against the Commissioner, or suits between private parties for injunctive relief requiring of one party conduct or inaction which will, in fact, violate an order of the Commissioner. Rather, the rule also extends to suits between private parties in which a particular order of the Commissioner is an operative fact upon which the determination of the parties' respective rights directly depends, even

**18.** The "right of appeal" here mentioned is the right to appeal from the trial court's decision in the suit under section 12 to the appellate courts, "in accordance with the general laws relating to appeals," as provided in LSA–R.S. 30:15.

though all relief sought can be given, such as by money damages or lease cancellation, without thereby causing any actual violation of the Commissioner's order. Thus, where the lessee has drilled on a unit established by the Commissioner and including the leased land, the lessor, in a suit to cancel the lease for want of production or for damages under a compensatory royalty clause respecting off-lease production, is prohibited from challenging the validity of the Commissioner's unit order. *Everett v. Phillips Petroleum Co.,* 218 La. 835, 51 So.2d 87 (1950); *Breaux v. Apache Oil Corporation,* 240 So.2d 589, 591 (La.App. 3d Cir. 1970); *Smith v. Carter Oil Co.,* 104 F.Supp. 463, 472 (W.D.La.1952); *Boutte v. Chevron Oil Company,* 316 F.Supp. 524, 525–26, 529 (E.D.La.1970), *aff'd per curiam,* 442 F.2d 1337 (5th Cir.1971).

The rule forbidding collateral attack on orders of the Commissioner has been applied to suits by lessors for lease cancellation or damages on account of drainage on the theory that the orders forming the respective units for the offending wells wrongfully excluded their lands. *Simmons v. Pure Oil Company,* 241 La. 592, 129 So.2d 786 (1961); *Pierce v. Goldking Properties, Inc.,* 396 So.2d 528, 534–35 (La.App. 3d Cir.), *writ denied,* 400 So.2d 904 (La.1981); *Savoy v. Tidewater Oil Company,* 218 F.Supp. 607 (W.D.La.1963), *aff'd per curiam,* 326 F.2d 757 (5th Cir.1964); *Mayer v. Tidewater Oil Company,* 218 F.Supp. 611 (W.D.La.1963).[19]

That such a suit is cast in terms of the defendant lessee's breach of duty to the lessor in requesting or procuring the unit order in question, rather than being expressly an attack on the Commissioner's

unit order itself, has not sufficed to prevent the suit from constituting an impermissible collateral attack on the order.

In *Simmons v. Pure Oil Company, supra,* Simmons leased to Pure a 60-acre tract all of which was in a then undeveloped 640-acre drilling unit, the unit order providing for the well to be located within 330 feet of its center, close to where the Simmons tract was. The Commissioner granted Pure's application to place its Holloway gas well at a different location on the unit, north and west of Simmons' land and considerably farther removed from it than the regular location would have been. Following its successful completion, Pure applied for a new unit for this well which would have excluded all of the Simmons tract, leaving it without a share in any production. The Commissioner granted the application, though modifying the new unit so that it included a third of the Simmons tract. Simmons then sued Pure to cancel the lease, claiming that Pure had violated its implied obligation under the lease to be "a good administrator" of the premises by procuring the orders in question "for the purpose of benefiting other lands held by it in another unit to the north of the original ... unit," and that absent such, all of the Simmons tract, instead of just one third, would have shared in production. 129 So.2d at 787, 790. Though Pure's Holloway well was shown to produce from a pool not connected with the rest of the field, Simmons alleged that all of the original 640-acre unit was within this "new" pool. *Id.* at 792. Simmons also claimed that Pure procured (and presented to the Commissioner) his written consent to the exceptional well location by fraudulent-

---

**19.** While we are, of course, concerned here only with Louisiana law, we note that the law in several other jurisdictions appears to also regard the same sort of complaint as an impermissible collateral attack on the unit order of the relevant oil and gas administrative regulatory body or commission. *See e.g., Mize v. Exxon Corp.,* 640 F.2d 637, 639–40 (5th Cir. 1981) (Alabama law); *Armstrong v. High Crest Oil, Inc.,* 164 Mont. 537, 520 P.2d 1081 (1974); *Mitchell v. Simpson,* 493 P.2d 399, 402 (Wyo. 1972); *Frost v. Gulf Oil Corp.,* 238 Miss. 775, 119 So.2d 759, 765–65 (1960). For application of the collateral attack doctrine in a somewhat

different context, *see Bolton v. Coats,* 533 S.W.2d 914, 915–16 (Tex.1975), *rev'g,* 514 S.W.2d 482 (Tex.Civ.App.—Tyler 1974); *Zimmerman v. Texaco, Inc.,* 409 S.W.2d 607, 613 (Tex.Civ.App.—El Paso 1966) (collateral attack and lack of jurisdiction), *writ ref'd n.r.e., per curiam,* 413 S.W.2d 387, 388 (Tex.1967) (no lack of jurisdiction); *Sun Oil Company v. Martin,* 218 F.Supp. 618, 625 (S.D.Tex.1963), *aff'd,* 330 F.2d 5 (5th Cir.1964) (collateral attack and lack of jurisdiction). *But see Renner v. Monsanto Chem. Co.,* 187 Kan. 158, 354 P.2d 326, 335–37 (1960); *Rush v. King Oil Co.,* 220 Kan. 616, 556 P.2d 431, 439–41 (1976).

ly representing that the well would not affect his land being in the unit.

The Louisiana Supreme Court affirmed the dismissal of Simmons' suit on the pleadings. Although in respect to the allegation of fraud in procuring Simmons' consent to the exceptional well location, the decision appears to rest in part on the theory that the order for the well location was not of itself harmful to Simmons—as any harm arose from the subsequent unit order—nevertheless it was also grounded to a significant extent on the "collateral attack" rule. The court noted that Simmons' allegations "may be said to be contrary to the findings of the Conservation Commissioner" and "contrary to the administrative holdings of the Conservation Commissioner," 129 So.2d at 790, and that:

"... since it is presumed *as a matter of law* that the Commissioner acted in good faith and on the basis of the evidence before him when he authorized the exceptional drilling location on the showing made by defendant, and also *when he reestablished the units* after finding that defendant had discovered a separate gas pool of the 'D' Sand in the Ruston Field and created a new spacing unit containing all the land which would be economically drained by the Holloway well, the charge that defendant has not acted as a prudent administrator in developing the property to the mutual advantage of the parties is nothing more than the pleader's conclusion which necessarily conflicts with the established facts." *Id.* at 791 (emphasis added).

And, in answering the contention that Simmons was entitled to relief from Pure because it "was guilty of manipulating the processes of the Conservation Commissioner" by applying "for the issuance of orders while concealing its true purposes" to act for "its own advantage," the court stated:

"This postulation is without merit. It occurs to us that *this is nothing more than a collateral attack* on the findings of the Commissioner, *which cannot be countenanced* (see *O'Meara v. Union Oil Co. of California,* 212 La. 745, 33 So.2d 506) as

counsel is really saying that the Commissioner was imposed upon so that he acted improvidently." *Id.* at 791–92 (emphasis added).

In *Savoy v. Tidewater Oil Company, supra,* there was a producing well on land adjoining that which the plaintiff Savoy had leased to the defendant Tidewater, and Savoy's land was placed in Unit 6 with this well by the Commissioner's 1958 order. Subsequently, *at the request of Tidewater,* the Commissioner on April 1, 1960 removed Savoy's land from Unit 6 and placed it in Unit 7, where the only unit well (of which Tidewater was also the lessee, under a different lease) was nonproductive. Effective April 1, 1961, another order combined all units into a single fieldwide unit. Savoy then sued Tidewater for lease cancellation and alternatively for the share of royalties he would have received from the Unit 6 well during the period April 1, 1960 to April 1, 1961, had his land not been removed from Unit 6 by the 1960 order. At the Commissioner's hearing leading to the April 1, 1960 order, Tidewater's representative, in response to the Commissioner's staff having brought out that the well on Unit 7 was nonproductive, "stated that they intended to install gas lift valves to eliminate salt water intrusion into this well and place it back in production." However, the court noted that "[a]fter the [April 1960] order was issued, this was never done, nor does it appear that Tidewater ever attempted to rework the Unit 7 Well." 218 F.Supp. at 608. Savoy was present at this hearing, but was not represented by counsel and apparently took no active part. During the period April 1960–April 1961, Tidewater tendered to Savoy an amount which it calculated would have been his share of the royalty from the nonproducing Unit 7 well had it been successfully reworked. However, this was less than the amount Savoy would have received had his land not been taken out of Unit 6, and he refused to accept it. Summary judgment affidavits "established without contradiction plaintiff's [Savoy's] land is structurally higher than the Unit 7 Well and consequently could have been more effectively drained by the well producing on Unit 6." 218 F.Supp. at 609.

The district court described the theory upon which Savoy based his suit as follows:

"It is the position of plaintiff that the lease should be cancelled because Tidewater did not recommend to the Commissioner the inclusion of Mr. Savoy's land in permanent Unit No. B–6, as his experts indicate that this land can be more effectively drained by the well serving that Unit." *Id.*

It then held that such a theory of recovery constituted the suit an impermissible collateral attack on the Commissioner's order, stating:

"This argument is clearly without merit ... because the decision made as a result of the information submitted at the hearing is the decision of the Commissioner, and not the defendant Tidewater, and as such it is not subject to collateral attack. LSA–R.S. 30:12. *O'Meara v. Union Oil Company*, 212 La. 745, 33 So.2d 506 (1947); *Everett v. Phillips Company*, 218 La. 835, 51 So.2d 87 (1950); *Simmons v. Pure Oil Co.*, 241 La. 592, 129 So.2d 786 (1961); *Smith v. Carter Oil Company*, D.C., 104 F.Supp. 463 (1952)." *Id.*

The district court accordingly granted Tidewater's motion for summary judgment. This Court affirmed by per curiam, calling attention to the "well considered opinion" of the district court and holding that Savoy's "suit was necessarily a collateral attack on the order of the Commissioner." *Savoy v. Tidewater Oil Company*, 326 F.2d 757, 758 (5th Cir.1964).

A similar situation was presented in *Mayer v. Tidewater Oil Company, supra.* Mayer owned a 133-acre tract leased to Tidewater, a portion of the tract being included in a 320-acre unit and the balance in an adjoining 340-acre unit, each unit being productive. Tidewater completed a well on land, which it held under a different lease, adjoining these two units and Mayer's land on the northwest. This new well was placed in a third unit. Then Tidewater applied to remove a portion of Mayer's land from the original two units, and the Commissioner, by Order No. 257–A–2, granted the application effective February 1, 1961.

The removed portion of Mayer's land was adjacent to the new third unit, and was of a size not normally sufficient to support a well. On June 10, 1961, Tidewater released this part of Mayer's land from its lease. Mayer then leased the released acreage to a third party, and it was proved productive and placed in a still different producing unit, effective January 1962. Mayer sued Tidewater for damages in the amount of the value of drainage from this part of his land during the period from February 1, 1961, when it was removed from the Tidewater units, until January 1962, when it was placed in the productive third-party unit. The court characterized Mayer's theory of recovery as follows:

"The petition alleges that *the application of defendant* which resulted in Order No. 257–A–2 was *not based upon sufficient geological information*, that *Tidewater's actions in so doing was unrealistic, and violated the obligations it owed to plaintiffs* not to allow or permit wilful drainage of the hydrocarbons underlying petitioners' property under the terms of the lease, under the terms of the Commissioner's Orders, and *under the implied obligations of the Lessee* to prevent drainage, depletion and waste." 218 F.Supp. at 612 (emphasis added).

The court sustained Tidewater's motion to dismiss Mayer's suit, holding it to be a collateral attack on Order No. 257–A–2, stating that

"... [an order of the Commissioner] is subject to attack (after the parties have exhausted the administrative remedy before him) not by a collateral suit as the one now before this Court but in the manner provided by LSA–R.S. 30:12. (*Id.* at 612.)

"...

"... [T]he recognized rule is that [respecting] a unit formed by the Commissioner (unless there might be some fraud alleged, which is not the case here) ... the only relief ... is by proper procedure, either administratively or in Court .... (*Id.* at 613.)

"...

" . . . [Mayer's suit] appears clearly to depend on the attack against the order of the Conservation Commission of Louisiana; and, as the law is so clear on that subject, the Motion to Dismiss should be maintained . . . . (*Id.* at 614.)

" . . .

"There is no allegation that defendant did not fairly present to the Commissioner all geological and engineering information in its possession. There is no showing or allegation of fraud or collusion. Accordingly, we hold that the decision reflected by Commissioner's Order No. 257–A–2 is not that of this defendant but that of the Commissioner, not subject to collateral attack." (*Id.* at 615.)

In the recent case of *Pierce v. Goldking Properties, Inc., supra,* the Louisiana courts again had occasion to consider the "collateral attack" doctrine. Goldking held a lease from Pierce and also a different lease on land owned by a third party adjoining the Pierce tract. Goldking brought in a gas well on this adjoining land, applied to the Commissioner for a unit, and commenced producing the well in February 1975. The unit hearing was held April 8, 1975, and the Commissioner fixed the unit to include an acceptable amount of the Pierce tract, effective May 1, 1975. Though the well had produced since February 1975 and drained the Pierce tract, Pierce received no royalty from the pre-May 1, 1975 production, and accordingly sued Goldking for lease cancellation or damages, alleging further "that the defendant had an obligation to represent the lessor fairly and completely before the Commissioner of Conservation and failed to do so." 396 So.2d at 534. In holding for the defendant Goldking, the Louisiana Court of Appeals stated:

"Finally, plaintiff alleges that Goldking breached its obligation to the plaintiff by failing to request that the effective date of the unit be the date of the public hearing, specifically April 8, 1975, rather than May 1, 1975, the date selected by the Commissioner. Plaintiff's contention constitutes a collateral attack on an order issued by the Commissioner of Conservation which is prohibited. *See, e.g., Sim-* *mons v. Pure Oil Co.,* 241 La. 592, 129 So.2d 786 (1961); *Mayer v. Tidewater Oil Co.,* 218 F.Supp. 411 (W.D.La.1963); and *Savoy v. Tidewater Oil Co.,* 218 F.Supp. 607 (W.S.La.1963), *aff'd,* 326 F.2d 757 (5th Cir.1964). Orders by the Commissioner can only be attacked via a direct action filed against the Commissioner in East Baton Rouge Parish. LSA–R.S. 30:12." *Id.* at 534–35.

## IV.

### *Possible Tension With Other Principles of Louisiana Law*

We recognize that this rule, which regards the lessor's suit against his lessee for the latter's fault in bringing about a damaging Commissioner's unit order as an impermissible collateral attack against the order, is not entirely free of tension with other recognized concepts of Louisiana law.

The "collateral attack" rule is perhaps a close cousin of res judicata and collateral estoppel. Yet, our understanding is that Louisiana has traditionally given res judicata much narrower scope than have common law jurisdictions and has never recognized collateral estoppel. *See Welch v. Crown Zellerbach Corp.,* 359 So.2d 154, 156 (La. 1978); *Scurlock Oil Company v. Getty Oil Company,* 294 So.2d 810, 817–18 (La.1974). However, these doctrines, whose normal operation concerns the effect of a judgment in one court proceeding on another court proceeding, differ somewhat from the collateral attack rule here considered, as it concerns the orders of a specialized administrative agency functioning largely outside of the court system. Moreover, the "collateral attack" rule, as we understand it, does not necessarily have as broad a preclusive effect as would common law res judicata and collateral estoppel. We may assume, for present purposes, that the collateral attack rule extends essentially no further than, subject to certain exceptions, to conclusively establish, in any court proceeding other than one under LSA–R.S. 30:12, the validity of the Commissioner's order when entered (unless the Commissioner has determined it

invalid as of such time), and that no different order would have resulted but for the lessee's claimed default. It would not necessarily forever establish as between the lessor and lessee all underlying facts which might have supported the order.

Possible tension with the collateral attack rule may also arise respecting other aspects of Louisiana oil and gas law. In *Breaux v. Pan American Petroleum Corporation*, 163 So.2d 406 (La.App. 3d Cir.), *writ denied*, 246 La. 581, 165 So.2d 481 (1964), the court observed that, although it was not necessary to a determination of the case before it, "[i]t is conceivable" that the lessor could recover damages for drainage "by proving that the lessee could have created a pooling unit, thus enabling the landowner to participate in the production from the draining well, but that he failed to do so." *Id.* at 415. In *Williams v. Humble Oil & Refining Company*, 290 F.Supp. 408, 422 (E.D.La. 1968), *aff'd and remanded with instructions*, 432 F.2d 165 (5th Cir.), *rehearing denied*, 435 F.2d 772 (5th Cir.1970), *cert. denied*, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 867 (1971), the district court, in reliance on *Breaux*, stated that the lessee "might have a duty to seek unitization" or to "make full disclosure to the lessor (directly or by filing sufficient information with the Commissioner of Conservation) in order to enable the lessor to take such action on this information as the lessor may deem appropriate, if any, perhaps by seeking unitization."[20] On appeal, this Court expressed its agreement, noting that a lessor could recover damages for drainage if he "proves that the lessee could have created a pooling unit" including lessor's land, and that a lessee

"... should perhaps disclose the fact of drainage to the lessor so that he may apply to the Louisiana Commissioner of Conservation for the establishment of a drilling unit. In appropriate circumstances failure to make a full disclosure may provide the basis for a cause of action for damages." 432 F.2d at 173 (footnote omitted).

This Court also observed that the lessee could defend by, among other things, showing "that he had attempted without success all reasonable means to establish a unit." *Id.* at 174.[21]

■■■■ However, unlike *Breaux* and *Williams,* the collateral attack rule does not focus on the duty of the lessee, but rather on the order of the Commissioner. The collateral attack doctrine does not come into play unless there is an actual order of the Commissioner which in fact deals with the particular subject matter at issue (*e.g.,* the appropriate unit for a given well), and the order has not been determined, either administratively or by suit under LSA–R.S. 30:12, to have been improper when issued. The collateral attack rule simply says that it generally may not be established that that particular order would have made provisions in respect to the subject matter it dealt with different from those it in fact made, had the lessee presented different evidence or requested a different result at the hearing. The rule does not address the lessee's duty to cause a particular subject matter to be before the Commissioner for his action thereon; and where the matter does not come before the Commissioner, then the collateral attack rule is inoperative and does not prohibit the lessor from showing that if the matter had been brought

---

**20.** The district court in *Williams* dealt with these matters in that part of its opinion, accompanying its order granting in part and denying in part the lessor's motion for summary judgment entirely on other grounds, written to determine the issues which would be submitted to the jury at the trial on the merits. 290 F.Supp. at 421.

**21.** Perhaps the strongest case for imposing a duty on a lessee to seek administrative action is with respect to matters concerning which the lessor is unable to take the initiative, such as drilling permits or exceptions. *See, e.g., Amo-*

*co Prod. Co. v. Alexander,* 622 S.W.2d 563, 570 (Tex.1981). Under Louisiana law, a lessor would apparently have standing to seek a unit order or amendment. LSA–R.S. 30:6 F. However, the opinions in *Williams* indicate that the existence of this right on the part of the lessor does not negate a duty on the part of the lessee to bring the subject matter before the Commissioner. *Williams,* 290 F.Supp. at 421–22; 432 F.2d at 173 n. 9. To the same general effect is *Sinclair Oil & Gas Co. v. Bishop,* 441 P.2d 436, 447 (Okl.1968).

before the Commissioner he would probably have acted on it and have done so with a particular result. But where the matter *does* come before the Commissioner and he *does* act on it, then the collateral attack rule generally precludes the lessor from asserting that that particular action would have been different had the lessee conducted itself differently at the hearing leading to the action.[22]

22. The existence of a duty on the part of the lessee to bring a matter before the administrative agency for action may not necessarily imply the existence or nature of any further duty on the lessee's part, once the matter is before the administrator for hearing and consideration, to at that hearing urge or present evidence in support of a particular result, at least where the lessor is entitled to notice of, and to participate in and appeal from, the administrative proceedings. But even if there were some such further duty, a matter we do not decide, this would not necessarily be determinative of the collateral attack question. The lessee's breach of such a further duty might entitle the lessor to recover expenses incurred either before the Commissioner or in a direct attack on the order (a species of relief not sought here), while the rule precluding collateral attack on the order nevertheless would generally prevent him from contending that that order would have been different than it was but for the lessee's breach. Kuntz, *Law of Oil and Gas,* states that " . . . the lessee should have no duty whatever to represent the lessor in administrative proceedings when the interests of the lessor and lessee are in conflict as to the administrative relief sought. For example, in proceedings to establish drilling units . . . ." *Id.* § 59.1 at 107. Subsequently, respecting conflicts arising from the lessee's operation of other leases, the example is there given of a well exception on an adjoining tract as to which "it would be irrational to expect him [the lessee] to prosecute and to defend with equal vigor an application for an exception well." *Id.* at 108. *Cf. Weymouth v. Colorado Interstate Gas Co.,* 367 F.2d 84, 95 (5th Cir.1966) (difficulty of conflicting duties recognized, but duty assumed, *arguendo* only, to exist). *But see Amoco Prod. Co. v. Alexander, supra,* 622 S.W.2d at 569–70 (where Commission would probably grant exception well, lessee's prudent operator duty to make application, which lessor could not make, is not defeated by the fact that other lessors of the lessee might be prejudiced). The text suggests that the result in this area might follow the particular jurisdiction's rule as to lessee-caused drainage. Kuntz, *supra,* at 108. We note that, at least for most purposes, it appears Louisiana does not regard lessee-caused drainage differently from other drainage, although where the lessee has already incurred the development costs of the draining well it could not urge that sharing in the drilling expense would render unitization uneconomical. *See Breaux,* 163 So.2d at 416–17; *Williams,* 432 F.2d at 172–74; Hardy, *Drainage of Oil and Gas From Adjoining Tracts—A Further Development,* 6 Nat. Res.J. 45 at 57–59 (1966). Kuntz continues by stating, "Where a conflict of interest arises from operation of the leased premises alone, such as a proceeding to establish the size of drilling units . . . the lessee should not be required to represent the interests of the lessor. The lessor should be required to represent himself. . . . If administrative procedures are available to him, he can seek judicial review of the resultant order if he is dissatisfied." Kuntz, *supra,* at 108. The *Savoy* and *Mayer* cases are then cited for the proposition that where the lessor appears at the administrative proceeding and does not object, subsequent suit against the lessee for having "failed to protect the lessor's interest may be barred as an attempted collateral attack on the order." *Id.* at 108 and n. 88.

However, contrary to what is perhaps the implication in the referenced passage in Kuntz, the *Savoy* and *Mayer* cases are not ones involving only a single lease held by the defendant lessee.

We also observe that if the lessor is entitled to notice and to participate in the hearing, then, absent some wrong by the lessee causing the lessor to forego those rights (which is not alleged here), the failure to appear or to object should put the lessor in no better position respecting the collateral attack rule than if he had appeared and objected. If the lessor does not appear because the required notice is not given, the order will be set aside for this reason on his direct attack, and the timeliness of his appeal will be judged by when he actually knew (or perhaps should have known) of the order. *Brown v. Sutton, supra; Jordan v. Sutton, supra.* If the lessor is notified, and has the right to be heard, it would seem that appearance or objection is a matter of the lessor's own choice, and should not affect the operation of the rule against collateral attack, which is not based on voluntary election of remedies, at least so long as some wrong on the part of the lessee does not prevent the lessor from exercising those rights.

We also recognize that in at least one area of its jurisprudence Louisiana appears not to preclude collateral attacks. In attorney malpractice cases, where the client claims his damage suit was lost because his attorney negligently failed to present certain evidence, "the court is . . . required to consider whether the omitted evidence would have produced a different result in the other [damage] suit, and . . . such con-

sideration ... in the ... [malpractice] suit does not constitute a prohibited collateral attack upon the judgment" in the damage suit. *See Toomer v. Breaux,* 146 So.2d 723, 727 (La.App. 3d Cir.1962), (however, proof there held too speculative). However, there are, of course, a number of significant differences between the lawyer-client-court and the mineral lessee-lessor-Commissioner relationships, and these differences can rationally support a distinction in the operation of the rule against collateral attacks.[23]

While our review of Louisiana decisions in other areas may indicate that the jurisprudence concerning prohibited collateral attacks on orders of the Commissioner does not in all respects easily fit into a single seamless and philosophically consistent web encompassing the entire body of legal doctrine, nonetheless we do not for that reason feel at liberty to modify the rule as announced in such cases as *Simmons, Everett, Goldking Properties,* and *Savoy,* or to depart from the principles which appear to underlie those decisions. We are aware of no Louisiana decisions modifying or limiting the rules set out in those and similar cases. With respect to what generally constitutes

an impermissible collateral attack on an order of the Commissioner, we appear to be dealing with relatively settled Louisiana law. Certainly it was so regarded by the district judge here, whose familiarity with Louisiana law is properly persuasive with us. *See Petersen v. Klos,* 433 F.2d 911, 912 (5th Cir.1970). Moreover, there being no intervening Louisiana decisions or legislation to the contrary, our holding in *Savoy* is plainly binding on this panel. *See Broussard v. Southern Pacific Transportation Company,* 665 F.2d 1387, 1389 (5th Cir.1982) (*en banc*).

## V.

*Consideration of Possible Exceptions to the Collateral Attack Rule*

The Trahans do not question the rule that generally a lessor, in a lease cancellation or damage suit against his lessee, may not recover on any theory which necessarily depends on a determination that a particular order of the Commissioner was erroneous.[24] They rather urge two somewhat interrelated exceptions.

> Moreover, the Commissioner is charged with affirmatively carrying out state policies having goals beyond the immediate interests of the particular parties in the proceeding before him, while this is not as much the case in typical litigation where adjusting the competing claims of the parties to that particular dispute assumes greater prominence. The Commissioner has the state's regulatory interests to further, and may act on his own independent sources of information, as distinguished from the more purely "referee" model of the typical court case. In the latter, therefore, the contentions advanced, and the evidence presented, by the contending parties generally form the only proper basis for the decision, while before the Commissioner other claims and sources of information have more significance.

**24.** Their brief states:

> "The jurisprudence interpreting LSA–R.S. 30:12 has been consistent in holding that when evidence is presented to the Commission at a hearing, the decision reflected by the Commissioner's order, which incorporates that evidence, is not the decision of the mineral lessee but that of the Commissioner of Conservation, which cannot be collaterally attacked."

**23.** Without belaboring the point, the lawyer is a licensed professional whose entire role is the representation of his clients; he holds himself out for this purpose and is permitted no personal or other conflicting interests, without regard to whether, in fact, his conduct is affected thereby, and he is a fiduciary as respects his client. *See Baty v. Balkcom,* 661 F.2d 391, 396–97 (5th Cir.1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982); *Zuck v. State of Ala.,* 588 F.2d 436, 440 (5th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 633, 62 L.Ed.2d 42 (1979). Normally, the lessee is a business whose main role is certainly not the representation of others and which is not licensed for such purpose; it does not stand in a fiduciary relation to its lessor (LSA–R.S. 31:122); it is not the lessor's agent; it does not purport, either to the lessor or to the Commissioner, to represent or to speak for the lessor, and is not authorized to do so; at least with respect to matters such as Commissioner orders fixing drilling units and forced pooling, the lessor is entitled to be heard and to request action independently of the lessee; the lessee is not prohibited from having interests conflicting with those of the lessor, and it is common knowledge that this frequently occurs. *See* note 22, *supra.*

First, they contend that their claim, that the Commissioner's January 1977 and January 1978 unit orders would have been different but for Superior's default, is not based upon any disagreement with or criticism of the evidence actually presented by Superior or considered by the Commissioner at the unit hearings, but is rather based on then existing evidence which was not before the Commissioner. Thus, their brief urges that "[o]nly when an attack is made upon the evidence submitted and adopted at hearing does LSA–R.S. 30:12 become effective, as in that case it is the Commissioner's decision which is being questioned."

We are not persuaded. We see no more reason to collaterally examine a unit order alleged to be the product of the lessee's negligent failure to present then existing evidence at the hearing than such an order alleged to result from the lessee's presentation at the hearing of a negligently erroneous interpretation of the geological data in evidence. The lack of value in such a distinction is illustrated by the opinion in *Everett v. Phillips Petroleum Co.*, 218 La. 835, 51 So.2d 87 (1951). There, the lessor sued for royalty due under a lease clause providing that the lessee would pay a percentage of the value of production from off-premises wells within a certain distance of the leased tract. The well in question was drilled within the specified distance by the lessee under a lease held by it on nearby lands owned by a third party. The lessor defended the suit on the ground that the tract where the well was had been unitized with the plaintiff-lessor's tract by an order of the Commissioner. This order had been issued following application therefor by the lessee, which had requested such a unit. 51 So.2d at 90–91. The lessor contended, however, that the unit order was invalid as it was "based entirely on testimony which was given to the Commission which was misleading and patently did not conform with the facts existing at the time." *Id.* at 92 n.

4. The court rejected this contention, stating:

" . . . [I]nsofar as concerns the claim that the Commissioner's orders are based on misleading evidence, counsel cannot, in this proceeding, assail those orders which are prima facie valid. The remedy, where it is contended that the Commissioner's action is arbitrary, is to obtain court review in a suit for an injunction against the Commissioner after all administrative remedies have been exhausted. See Section 11 of Act No. 157 of 1940 [now LSA–R.S. 30:12] and *O'Meara v. Union Oil Co. of California*, 212 La. 745, 33 So.2d 506." *Id.*

The Trahans contend that *Everett* is distinguishable because there the allegedly erroneous unit resulted from "misleading evidence" actually presented to the Commissioner, while here it resulted from the Commissioner's not being presented with existing pertinent evidence at the unit hearings. The suggested distinction is not substantial, for the Commissioner may be just as misled, and the lessee just as much at fault, in the one instance as in the other. However, the Trahans appear to urge that the distinction is appropriate because while they could effectively appeal the Commissioner's order if it were based on inadequate or misinterpreted evidence introduced at the hearing, they could not challenge his order if it were supported by the evidence actually submitted, even though then existing evidence not submitted at the hearing might clearly demonstrate that the order was wrong.[25] This line of reasoning, however, ignores the fact that suit under LSA–R.S. 30:12 is not a review "on the record," the "substantial evidence" rule does not apply, and the parties are not limited to the evidence before the Commissioner, but they may present, and the court in passing on the validity of the order is required to consider, "all pertinent evidence with respect

---

**25.** In their brief the Trahans contend:

"If defendants are allowed to simply raise a collateral attack defense plaintiffs will have *no* relief. No suit would lie against the Commissioner of Conservation as his decision, based upon evidence actually submitted, must be taken and would be sustained as prima facie valid as he acted upon the evidence presented."

to the validity and reasonableness of the order." *Jordan v. Sutton, supra; Mobil Oil Corporation v. Gill, supra.* Moreover, the Trahans were apparently entitled to notice, and were notified, of the unit hearings, and were entitled to make their own requests and present their own evidence there. They do not allege that the evidence not presented was unavailable to them, and indeed it appears to have been a matter of public record, or that Superior did anything to cause them not to present it.

The second branch of the Trahans' argument focuses on the above-quoted language from *Mayer v. Tidewater Oil Company, supra,* that "[t]here is no allegation that defendant did not fairly present to the Commissioner all geological and engineering information in its possession." 218 F.Supp. at 615. We do not construe this language to pertain to a *nonfraudulent* failure to fairly present. In the very next sentence the *Mayer* opinion states "[t]here is no showing or allegation of fraud or collusion." *Id.* Earlier in that opinion the Court stated that relief against assertedly improper unit orders was available only administratively or by a direct attack "(unless there might be some fraud alleged, which is not the case here)." *Id.* at 613.

▮ Nor are we inclined to create a special exception to the collateral attack rule for a *nonfraudulent* failure of the lessee to fairly present at the hearing all evidence in its possession, at least not as respects matters as to which the lessor is entitled to notice and opportunity to present evidence before the Commissioner and it is not alleged that the lessor failed to do so on account of something the lessee did or that the lessee undertook to represent the lessor at the hearing. So far as such a "failure to fairly present" argument focuses on an asserted distinction between the *actual submission* of faulty (or erroneous or misleading) evidence and *the failure* to submit relevant evidence, neither of which is fraudulent, we are of the opinion that the distinction is not meaningful, for the reasons earlier stated. So far as the focus is on the difference between evidence which is in the lessee's possession and that which is

not, we do not believe a principled distinction can generally be made on such a basis (assuming there is no fraud). The Commissioner can be just as misled in either case, and, depending on the circumstances, the lessee can be just as negligent in not obtaining and presenting evidence as in failing to present evidence in its possession, due to inadvertence or misinterpretation of the evidence or its significance. To the extent that "failure to fairly present" relates to the nonfraudulent "unfairness" of the presentation of evidence actually submitted, we believe that *Everett* ("misleading evidence") and *Simmons* ("manipulating the processes of the Conservation Commissioner") implicitly reject any such exception to the collateral attack rule.

And, on a broader basis, to adopt an exception to the collateral attack rule which is predicated on mere negligence of the lessee in its presentation at the hearing before the Commissioner would necessarily be inconsistent with *Savoy,* by which we are bound. The lessee there was, in effect, alleged to have breached its prudent operator duty by recommending to the Commissioner that the lessor's land not be included in the productive unit, and obviously failed to present to the Commissioner the evidence which established that the lessor's land would be more effectively drained by the well on that unit. We see no basis for distinguishing among various merely negligent (or nonprudent-operator) derelictions on the part of the lessee at the hearing before the Commissioner, allegedly causing erroneous Commissioner orders, simply on the basis of whether the particular dereliction relates to the manner of presentation, the content of what is presented, the failure to present evidence possessed by the lessee or which it ought to have possessed, the argument made to the Commissioner, the relief requested, or other similar matters pertaining to the lessee's conduct at the particular hearing and allegedly affecting its outcome.

## VI.

### Conclusion

The district court, to whose familiarity with Louisiana law we properly give serious

consideration, concluded that this was an inappropriate case for an exception to the rule precluding collateral attacks on orders of the Commissioner. We agree. While exceptions to the collateral attack rule may be appropriate where the lessee is guilty of fraud,[26] or where it has undertaken to represent the lessor before the Commissioner or its derelictions prevent the lessor from adequately representing itself, or where the lessor has no standing with regard to the administrative matter at issue or no right to be heard before the Commissioner and to appeal the order, none of such matters are alleged here. We do not believe that Louisiana law recognizes an exception to the rule prohibiting collateral attack on orders of the Commissioner merely on the basis of a lessee's nonfraudulent failure to fairly present at the unit hearing all pertinent geological and engineering information in its possession, such as the Trahans charge here. *Savoy, supra.*

We do not suggest that where, after a unit order is entered, subsequent developments, such as those arising from new wells or reported pressure changes or the like, indicate the unit should be changed, the lessee is necessarily free to disregard such developments simply because of the prior order. The lessee may be under a duty to have the matter of unit amendment brought before the Commissioner, or to inform the lessor so he can do so. Breach of such a duty might authorize relief predicated on adequately established proof as to what action the Commissioner would have taken, had he acted in the premises. *See Williams, supra.* Since such a situation is not one in which it is alleged that a particular order would have made different provisions from those it in fact made, it would appear that no order of the Commissioner is being collaterally attacked.[27] But where, as here, the Commissioner has in fact acted, the collateral attack rule generally prevents inquiry as to whether that particular action of the Commissioner would have been different had the lessee not been guilty of a nonfraudulent failure to fairly present at the hearing all then existent geological and engineering information in its possession. The case at bar does not fall into any recognized or principled exception to the rule preventing such a collateral attack.

As we agree with the district court that the Trahans' suit constitutes an impermissible attack on the order of the Commissioner, the judgment below is affirmed.[28]

AFFIRMED.

---

**26.** Decisions in other jurisdictions indicate that fraud may preclude reliance on an administrative order. *See Hall Jones Oil Corp. v. Claro,* 459 P.2d 858, 863 (Okla.1969) ("knowingly and intentionally falsifying and concealing"); *Pan American Petroleum Corp. v. Hardy,* 370 S.W.2d 904, 908 (Tex.Civ.App.—Waco 1963, writ ref'd n.r.e.) ("wilful false representations"). *But see Bolton v. Coats,* 514 S.W.2d 482, 487 (Tex.Civ.App.—Tyler 1964), *rev'd on other grounds,* 533 S.W.2d 914 (Tex.1976) (holding that only "extrinsic fraud," as distinguished from "intrinsic fraud," is sufficient to authorize a collateral attack so as to prevent the defendant lessees, under whom plaintiff held an overriding royalty, from relying on a Railroad Commission order).

**27.** When after the original unit order subsequent developments occur indicating the lessor's land should be included, and substantial drainage thereafter takes place well before the matter of unit amendment is brought before the Commissioner, and assuming the Commissioner may not lawfully make a unit amendment retroactive to a time prior to the application and accordingly includes the lessor's land in the unit effective only on and after the application, it may be doubted that the collateral attack rule could properly be invoked in respect to the order nonretroactively including the lessor's land, so as to prevent, solely on that ground, the lessor's suit against the lessee based on the lessee's failure to have sooner brought the matter before the Commissioner for action or informed the lessor so he might do so.

**28.** Our affirmance moots Superior's attempted cross-appeal.