STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 07-821


HENRY SANDERS

VERSUS

STATE OF LOUISIANA, DEPARTMENT OF NATURAL RESOURCES


**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 33,917
HONORABLE JOHN PHILIP MAUFFRAY, JR., DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Michael G. Sullivan, Glenn B. Gremillion, and Billy Howard
Ezell, Judges.


**REVERSED.**


**Albin Alexandre Provosty**
**Provosty, Sadler, deLaunay**
**P. O. Drawer 1791**
**Alexandria, LA 71309-1791**
**(318) 445-3631**
**Counsel for Defendant/Appellant:**
**State of Louisiana, Department of Natural Resources**

**William Henry Sanders**
**J. Christopher Peters**
**Attorney at Law**
**P. O. Box 1363**
**Jena, LA 71342-1363**
**(318) 992-8251**
**Counsel for Plaintiff/Appellee:**
**Henry Sanders**

**Ezell, Judge.**

Henry Sanders filed a suit against the State of Louisiana involving land located on Catahoula Lake. Mr. Sanders sought to be recognized as possessor of a certain area of land and also asked that a boundary be established between his land and the land owned by the State, as owner of the bed of Catahoula Lake and/or Little River. Additionally, Mr. Sanders sought an injunction prohibiting the State from "artificially flooding and holding of water or by artificially inducing a rapid rate of regression of back water and overflow water." Finally, Mr. Sanders sought an award of damages against the State, alleging that the State was in bad faith.

The trial court denied Mr. Sanders' last two claims. However, the trial court found that the proper ordinary high water mark of Catahoula Lake in 1812 was 30.1-foot elevation above mean sea level (MSL), as opposed to the 36-foot elevation that the State claimed. The trial court also found that Mr. Sanders was possessor of the lands he claimed. Due to these findings, the trial court limited Mr. Sanders' damages to any amounts of proceeds that the State has received from the granting of mineral leases and/or production of minerals beginning April 7, 1994, from the lands possessed by Mr. Sanders which were between the elevations of 36 feet MSL and 30.1 feet MSL. The State appealed the trial court's determination of the ordinary high water mark of Catahoula Lake.

## FACTS

Mr. Sanders filed this suit on April 7, 2004. Mr. Sanders' property is located along the Devil's Creek-Hemphill Creek delta or alluvial fan of Catahoula Lake. In the suit, Mr. Sanders claimed possession of the following lands:

> That portion of the West one-half of Section 30, Township 7 North, Range 4 East, lying South of the existing Justiss Oil Company, Inc. - Whitehall Plantation fence and lying West of the bank of Catahoula Lake and U.S. Government Lot No. 1 of Section 25, Township 7 North,

1

Range 3 East including all of said lands that are bottom hardwood land, grass lands, sandridges, elm and swamp privet lands, all of which lands are known as riparian lands covered with back water and overflow water during the wet season of the year.

Mr. Sanders alleged that his possession had been disturbed by the State due to a March 2004 report which relied on the Russell-Brown study from 1941-1942 indicating that the ordinary high water mark of Catahoula Lake was located at 36 feet MSL.

Louisiana became a state on April 30, 1812. The United States General Land Office (GLO) surveyed the area around Catahoula Lake between 1813 and 1884. Much of the land bordering and lying outside Catahoula Lake was selected and approved as swampland and transferred to the State by the United States Government under the Swampland Acts of 1849 and 1850. These Acts provided that all swamp and overflowed lands unfit for cultivation shall be granted in fee simple to the State to aid in construction of necessary levees and drains for reclamation of swamp and overflowed lands. The State then transferred these swamplands to levee districts who could use the land or sell it for necessary monies. Mr. Sanders' title is derived from these transfers.

A trial was held for approximately two weeks between July 25, 2006, and August 3, 2006. The trial court issued written reasons for judgment. In determining the ordinary high water mark, the trial court ruled that "from 1800 to the present, Catahoula Lake was and is an intermittent body of water with no traditional 'shoreline.' And, because of such fact, traditional methods of determining where the usual high water level is simply not applicable." The trial court further held that "in this present situation the most reasonable result for the normal high water level of the lake should be established at that level where the main distributary, Little River, becomes a tributary due to back flow from the Black River (as well as the Ouachita

2

and Tensas)." Randall Smoak, a professional civil engineer, testified on behalf of Mr. Sanders. He correlated water level activities and the relationship between the Black River and Catahoula Lake utilizing gauge readings taken between 1961 and 1971, prior to the construction of water level control structures in Little River and Catahoula Lake. The trial court's conclusion as to the ordinary high water level of Catahoula Lake was based on Mr. Smoak's correlation of the gauge readings indicating that 30.1 feet above MSL is the level at which water from the Black River will flow back through the Little River into Catahoula Lake.

## DISCUSSION

On appeal, the State argues that the trial court erred in setting the ordinary high water level at 30.1 feet MSL based upon analyses of gauge data during an eleven-year period that correlated levels on Black River with levels on Catahoula Lake and excluded all levels during the annual high water season. The State asserts that the 36-foot contour, as it existed in 1942 and as surveyed by Heard and Daigre, represents the true ordinary high water level of the lake today and in 1812.

Louisiana courts of appeal apply the manifest error standard of review in civil cases. *Hall v. Folger Coffee Co.*, 03-1734 (La.4/14/04), 874 So.2d 90. Under the manifest error standard, a factual finding cannot be set aside unless the appellate court finds that the trier of fact's determination is manifestly erroneous or clearly wrong. *Smith v. Louisiana Dept. of Corrections*, 93-1305 (La.2/28/94), 633 So.2d 129, 132. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Id.*

The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. *Id.*; *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently. *Id.*

3

*Detraz v. Lee*, 05-1263, p. 7 (La. 1/17/07), 950 So.2d 557, 561.

There is no dispute that, as to lakes, the State owns the land below the ordinary high-water mark. *State v. Placid Oil Co.*, 300 So.2d 154 (La.1973), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784 (1975); *McCormick Oil & Gas Corp. v. Dow Chem. Co.*, 489 So.2d 1047 (La.App. 1 Cir. 1986). Furthermore, "[t]here is no right to alluvion or dereliction on the shore of the sea or of lakes." La.Civ.Code art. 500.

In determining the meaning of "ordinary high water," as it pertains to a river, the supreme court in *DeSambourg v. Board of Commissioners for Grand Prairie Levee District*, 621 So.2d 602, 613 (La.1993), *cert. denied*, 510 U.S. 1093, 114 S.Ct. 925 (1994), defined it as "the highest level the river inevitably reaches during annual seasons of high water, which is the highest stage the river can be expected to reach yearly." We find this definition equally applicable to the waters of a lake.

A description of Catahoula Lake can be found in the "Catahoula Lake Area Report" presented to Governor Kennon and the Louisiana Legislature by the Louisiana Department of Public Works in 1954:

> The lake bed proper has a length of about 14 miles and an average width of 3 miles covering an area of some 42 square miles or about 27,000 acres. The western Louisiana uplands adjoin the lake bed on the west and northwest. To the south and southeast of the lake bed lies alluvial area. The lowest portion of the lake's bed of any appreciable extent is at elevation 27 feet m.s.l. . . . The principal tributary to the lake is Little River which enters the lake at its southwest end. It traverses the lake in a relatively wide and shallow channel to the northeast end of the lake, a total distance of about 15 miles. Outflow from the lake is principally through French Fork and Old River which join at Lavaca forming Little River down which the flow is carried to Black River at Jonesville. One other principal outlet or distributary of the lake, which serves mostly for flood flows, is Big Saline Bayou which emerges from the lake near its southwest end meandering southeasterly to join Red River. Other outlets for flood waters are Sandy, Indian, Muddy, Cypress and Big Bayous, all of which lead off in a southeastern direction through either Saline Lake or Larto Lake to Red River.
>
> . . . .

4

A watershed area of 2,672 square miles contributes to the lake. The area is composed principally of upland hilly timbered area and extends generally northwestward from the lake to Ruston and the vicinity of Arcadia, an airline distance of some 80 miles with an average width of about 33 miles. Little River drains an area of 2,555 square miles above its entry into the lake.

No one disputes the trial court's finding that Catahoula Lake is a lake, and it was stipulated at trial that it was navigable in 1812. The State disagrees with the trial court's finding that the lake is an "intermittent" lake versus a perennial lake which has a consistent water bowl. An intermittent lake is one that disappears seasonally as compared to an ephemeral lake which is one that lasts only a short while because it is associated with an event like heavy rainfall. In finding Catahoula Lake to be an intermittent lake, the trial court found that water did not stand in Catahoula Lake for a sufficient period in order to create a traditional shoreline. Thus, it accepted the gauging method testified to by Mr. Sanders' expert to determine the ordinary high water mark, as opposed to using the physical evidence method promoted by the State. It makes no difference how we classify Catahoula Lake. It is still a lake, and the proper determination of the State's ownership is the ordinary high water mark.

The trial court relied on the testimony of Carl Smoak, a civil engineer, in concluding that 30.1 feet was the ordinary high water mark of Catahoula Lake. In accepting the gauging method as the proper method of determining the high water mark, the trial court found that the most reasonable result for the normal high water level of the lake should be established at that level where the main distributary, Little River, becomes a tributary due to the back flow from Black River. The trial court found that the traditional definitions of overflow and back flow were not applicable because there were no banks in the lake bed for this back water to flow over the top. It found that the normal high water level was more appropriately defined by Catahoula Lake's function as it relates to the whole drainage of the area.

Mr. Smoak used gauge data from Black River from the years 1960 to 1972 and gauge data from Catahoula Lake from the years 1961 to 1971 to reach his conclusions. Mr. Smoak testified that he strictly looked at gauge readings from those two areas and did not feel it necessary to look at the effect of other tributaries feeding into Catahoula Lake. It was his opinion that when Black River was rising it was influencing the rise of Catahoula Lake. He opined that any level in Catahoula Lake above 30.1 feet was caused by Black River during the eleven-year period of gauge readings. Mr. Smoak admitted that he excluded any lake levels from the gauge data information once Black River exceeded the level of Catahoula Lake.

Swamplands subject to overflow are private things. *State v. Barras*, 615 So.2d 285 (La.1993); *Buckskin Hunting Club v. Bayard*, 03-1428 (La.App. 3 Cir. 3/3/04), 868 So.2d 266. Furthermore, privately owned land does not become subject to public use when a navigable body of water overflows its normal bed and temporarily covers the adjacent land. *Edmiston v. Wood*, 566 So.2d 673 (La.App. 2 Cir. 1990). However, this is not the situation that is involved here.

The situation at Catahoula Lake is not a temporary or extraordinary situation. It has been occurring for hundreds of years. What is involved is the natural flow of water between connected water bodies. Everyone agreed that these bodies of water stay within their natural beds. Catahoula Lake always reaches a certain normal high level during several months of the year. It is obvious from the physical characteristics around Catahoula Lake that this is a natural and ordinary occurrence for the lake. None of the tributaries, including Black River, overflow their natural beds. Black River, along with other tributaries, contribute to the water flowing in and out of Catahoula Lake.

In *State v. Placid Oil Co.*, 300 So.2d 154, the supreme court approved its prior decision in *Amerada Petroleum Corp. v. State Mineral Board*, 203 La. 473, 14 So.2d 61 (1943), wherein it clearly defined a lake as a body of water which is more or less stagnant and is supplied by drainage. This is exactly the situation of Catahoula Lake. Other water bodies drain into this area. Therefore, we find the level at which Black River, or any other tributary, affects Catahoula Lake to be of no moment. The ordinary high water mark of Catahoula Lake is normally reached by the influence of other water bodies.

We find that the trial court committed manifest error in relying on the testimony of an expert who correlated gauge readings under the assumption that the effect of Black River on Catahoula Lake should determine the ordinary high water level and omitted any readings above this level. Evidence revealed that gauge readings were far above 30.1 feet for much of the year in Catahoula Lake. In 1961, the elevation at Catahoula Lake was in excess of 45 feet for 116 days and for 143 days in 1962. We recognize that the supreme court in *DeSambourg*, 621 So.2d 602, found that the trial court did not err in using river gauge data to determine the ordinary high water mark on the Mississippi River at Shingle Point. However, in that case, the court had almost a century of gauge data in making this determination versus a mere eleven years of data available in this matter. In *DeSambourg*, the ordinary high water level was calculated without consideration of both unusually high or low annual readings. Here, Mr. Smoak eliminated any gauge readings above the 30.1 feet. Furthermore, the gauge readings used by Mr. Smoak did not take into account any effect of man-made levees which were completed after 1812.

No one disputes that it is the ordinary high water level as it existed in 1812 in Catahoula Lake that determines the extent of the State's ownership. This is

7

evidenced by the physical characteristics surrounding the lake. While the trial court found the Russell-Brown study to be scientifically unreliable, the physical characteristics test has been used by both state and federal courts in determining the ordinary high water mark. *See* John A. Lovett, *Batture, Ordinary High Water, and the Louisiana Levee Servitude*, 69 Tul.L.Rev. 561 (1994). The evidence clearly established that it while the water does not stand at 36 feet year round, it does stand at this level for a big part of the year, which is long enough to make an imprint on nature.

The closest piece of evidence in time to 1812 as to the nature of Catahoula Lake is an article written by William Darby in 1817 entitled, "A Geographical Description of the State of Louisiana, the Southern Part of the State of Mississippi, and Territory of Alabama." Before writing the article, Darby undertook a study of the area for eleven years from 1806 to 1817. In describing the Catahoula Lake area, Darby stated:

> Fourteen miles below the Boeuf, the Ouachitta loses its name by its union with the rivers Tensaw and Ocatahoola. This singular small river, Ocatahoola, is a very striking example to show how near the surface of Louisiana approaches that of the superficies of a real sphere. The map will exhibit the places where this river has its sources but no delineation upon a plane can convey correct ideas of the peculiar traits of its geography. The lake through which this river flows, is alternately a wide expanse of water ten or fifteen feet deep, and an extensive grassy plain, the river winding through its center, and receiving several fine creeks from the north, which in the season of inundation empty themselves into the mass of water at the margin of the woods.

Also included in Darby's materials was a map of Louisiana constructed from actual surveys and observations. The map indicates that Catahoula Lake is a massive water area in Louisiana which was then named "Ocatahoola Lake."

Between 1814 and 1865, GLO surveyors surveyed around the perimeter of Catahoula Lake. The lines they surveyed along the edge of the lake are called

8

meander lines.  Both Mark Tooke, the expert surveyor for Mr. Sanders, and Frank Willis, the State's expert surveyor, testified that meander lines are not considered property boundaries unless deeds specifically state that they are.  In other words, the meander lines do not set the boundary between private and public ownership.

As testified to by Mr. Willis, meander lines can have different meanings under different conditions.  The purpose of the earlier surveys was to determine the approximate location of the lake and to plot the sinuosities of the shoreline so that the land could be patented out.  This was all done before the Swamplands Acts.  Field notes from the different surveyors were introduced into evidence. One such field note indicated that the GLO surveyor ran a line along the water's edge.

During the 1940's, oil was discovered in the area.  At the request of Carter Oil Company, Richard Joel Russell, a professor of physical geography with Louisiana State University, conducted a field investigation to determine the elevation of the shoreline of Catahoula Lake.  He observed that the building of artificial levees along the Mississippi, Red, and other rivers had resulted in increasing flood levels not only in Catahoula Lake but also in adjacent swamps.  This influence was not present in the year 1812 and did not become pronounced until after the year 1882, when the levees had really become effective in blocking outflowing flood waters and in raising river stages.  Dr. Russell further noted that the lake has been subjected to unnatural ranges in stage elevations during more recent years.

Dr. Russell was assisted by Clair Brown, an associate professor of botany with Louisiana State University.  He examined the vegetation surrounding Catahoula Lake, starting in 1936 and also in the years 1937, 1940, and 1942. Dr. Brown observed that Catahoula Lake has considerable fluctuation of the water levels during different seasons of the year which is reflected in the zonation of the vegetation around the

9

lake.

In determining the normal high water level of Catahoula Lake, Dr. Russell observed that the stage variations of Catahoula Lake are extremely variable from week to week, season to season, year to year, or decade to decade. He further stated that:

> [E]ven if we had observations extending over many years we would have difficulty in justifying a mean high stage on the basis of gauge records, for the reasons that the year or decade following would not likely yield the same result. In every sense the gauges of nature serve the best for determining the elevation of Catahoula Lake, for they record averages that have been established over a long range of years.

In finding that physical evidence indicated a normal high water mark at 36 feet MSL in 1812, Dr. Russell stated that:

> The more positive criteria for the recognition of mean high stages are such things as the elevation of deltas built into the lake, the elevations of flood plains of both inflowing and outflowing streams, the distribution of vegetation, and such shore features as beaches and wave-cut notches. It is the 36-foot shore that shows the greatest development of all these features, persistently, and all sides of the lake.

Dr. Russell further stated that "[t]he 36-foot shore today is farther out in the lake than was the shore in 1812, because these deltas have all grown lakeward, extending land beyond 1812 shore positions." Dr. Russell also observed:

> In 1812, as in succeeding years on up until about 1882, the northwestern side of Catahoula Lake was relatively stable. A wave notch was present at the elevation of 36 feet and a cypress zone became established along the mean high shore line of the day. These trees are still living and may be seen today, with trunks in excess of two feet in diameter.

The importance of the cypress fringe at the 36-foot elevation was explained by Dr. Brown:

> The seeds and the fruits of cypress are adapted for water transportation and thus float for some time. In low, swampy woods the winter water level is usually the highest level, except for floods, and can be traced by the distribution of stranded fruits. Therefore, in order to have a well established cypress zone, the water level must have remained relatively constant for many years before man upset natural conditions by the

10

removal of the virgin timber, the construction of dams, roads and levees. The cypress tress of this zone are very large and very old. . . .

The low height of the cypress knees likewise indicates that these trees grew near the margin of the lake. Cypress knees are supposed to be an adaptation for securing oxygen for the root system in water logged or poorly aerated soils. Thus the knees must protrude above the water level for a few inches. The height of the cypress knees has been correlated with the depth of the water. High knees indicate deeper water than low knees. Also in areas with a very high and long hydroperiod, knees do not develop.

It has been shown that the development of the conspicuous buttress base of trees is correlated with flooding, the height of the floodwaters, and length of submergence. The swollen part of the trunk is the part which has been submerged for short intervals of time. The zone of maximum swelling is at the level in which flood waters stayed the longest time. The bottle-shape of the buttress is best developed on the occasional cypress . . . in the water elm-swamp privet forest, well developed on the cypress fringe, and less so on the scattered cypress of the mixed hardwood zone.

Based on the vegetation in the area, Dr. Brown concluded that 32.8 feet was the normal water level, the normal high water level was 36 feet, flood stage was located at 43 feet, and extreme flood stage was located at 46 and 48 feet.

Following Drs. Russell's and Brown's investigation, the Louisiana Department of Public Works conducted a meander survey around the periphery of Catahoula Lake following the 36-foot contour. This survey has become known as the Heard and Daigre survey of 1942. A map introduced into evidence depicts both the meander line from the GLO surveys and the survey of Heard and Daigre. There is a general agreement between the two.

Mr. Sanders retained the services of George Flowers, an expert in geology with a speciality in geochemistry. Mr. Flowers put together a team to investigate the Catahoula Lake area which included Dr. Leonard Thien, an expert botanist. The Flowers-Thien study concluded that the ordinary high water mark was at 29 feet because it is the edge of the bowl. Mr. Flowers disagreed with Dr. Russell that there

11

was a standing lake in 1812, although he agreed that lake stood in the area at 36 feet for an extended period of time prior to 1800.

Mr. Flowers agreed that there were four bench cut areas indicating that water stood at that level for sufficient time to create a cut in the bedrock. The bench cuts were located at 42-40 feet, 36-35 feet, 31 feet, and 28 feet. One hypothesis of Mr. Flowers for the 35-foot shoreline was that during the Great Raft, the raft extended further down to Catahoula Lake and held the lake there. He further hypothesized that Catahoula Lake was not directly influenced by the raft when Louisiana became a state in 1812. No other testimony or evidence was offered to support the conclusion that Catahoula Lake was a raft lake. There was a general discussion of raft lakes that had been created by the Great Raft and the cypress fringes that formed as a comparison to Catahoula Lake, but no one has claimed herein that Catahoula Lake was a raft lake. Mr. Flowers did not contest that there was a well-defined shrine around the lake but contested that it was relevant in 1812.

In determining the age of the cypress trees, Dr. Thien utilized the Brown and Montz method which uses the diameter of the tree to estimate its age. This method placed the ordinary high water mark farther out in the lake.

To reevaluate the Russell/Brown study, the State hired Dr. George Castille, an expert in archeology and geography, and Patricia Young, an expert in dendro-ecology, which involves the study of tree rings. Dr. Young used the core method to analyze the age of the cypress trees, which the trial court agreed was more reliable than the Brown and Montz method of measuring the diameter of trees. Dr. Young testified that the Brown and Montz method, in general, overestimated the age of the younger, faster-growing trees. Dr. Young explained that cypress trees like fluctuation in water and will not generate unless there is a drought period. Dr. Young found that

the bald cypress trees at Catahoula Lake tend to cluster at 36 feet. She testified that the flooding effects of the trees suggested that the cypress fringe has historically and continues to establish at this same area. There are trees of multiple age classes in the area. She found no evidence that points to a cypress fringe at an elevation below the 36-foot contour. Dr. Young further stated that the trees measured by Dr. Thien were less than 200 years old except for one. She was impressed that the Russell-Brown study classification of 36 feet as the ordinary high water mark was correct. She agreed that there are trees above and below the 36-foot level, but they thin out.

Dr. Castille testified that he saw the cypress fringe in every area he looked. It was his conclusion that if the ordinary high water mark for Catahoula Lake in 1812 was around 30 feet, then the basin would be full of forest. He explained that you would see a new generation of cypress trees at the new ordinary high water line down to the new ordinary low water line, but there was no physical evidence of this. Dr. Castille testified that as you move out into Catahoula Lake, the number of old growth cypress begins to decline. He stated that the large trees in the lower elevations are young based on the core samples. Dr. Castille found that Dr. Russell and Dr. Brown performed a valid and comprehensive investigation.

In performing his survey, Mr. Willis observed that the Flowers-Thien line is not anywhere near the cypress fringe that he observed. He saw no basis for this line as the line of the ordinary high water mark.

Mark Tooke, who surveyed the area for Mr. Sanders, did not dispute the methodology of the Russell-Brown study. He agreed that there was a cypress fringe around the lake and that he had personally observed in addition to the fact that it is very near to what appears to be the shore of the lake. Mr. Tooke was in further agreement that the survey by Heard and Daigre was a general facsimile of the

13

meander lines from the GLO surveys.

In summary, the trial court was manifestly erroneous in placing the ordinary high water mark at 30.1 feet MSL.  This finding was based on a correlation of gauge data  that excluded any readings over 30.1 feet on the erroneous conclusion that the effects of water from other tributaries should not be considered in calculating the ordinary high water mark.  The remaining evidence was based on the physical characteristics of Catahoula Lake which clearly established that the ordinary high water mark in 1812 was 36 feet MSL as surveyed by Heard and Daigre in 1942.

The judgment of the trial court is reversed.  Costs of this appeal are assessed to Henry Sanders.

**REVERSED.**

14