# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 29, 2010

Lyle W. Cayce
Clerk

No. 09-30363

EOG RESOURCES INC.,

Plaintiff — Appellant

v.

CHESAPEAKE ENERGY CORP; CHESAPEAKE OPERATING INC;
CHESAPEAKE LOUISIANA LP,

Defendants — Appellees

Appeal from the United States District Court
for the Western District of Louisiana

Before REAVLEY, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Appellant EOG Resources, Inc. ("EOG") and Appellees (collectively, "Chesapeake") own mineral leases in a unitized pool of natural gas in Bossier Parish, Louisiana. In 2006, Chesapeake drilled three wells without obtaining EOG's permission, in alleged violation of an Operating Agreement between the two. EOG filed suit for breach of contract. Chesapeake argued that it did not breach the Operating Agreement and that the suit was an impermissible collateral attack on orders of the Louisiana Commissioner of Conservation. We reverse the judgment of the district court that the suit was an impermissible

No. 09-30363

collateral attack, vacate the district court's finding as to breach of contract, and remand for further proceedings.

## FACTS AND PROCEEDINGS

EOG and Chesapeake each own mineral leases in Section 18 of Bossier Parish, Lousiana and are successors in interest to a 1957 Operating Agreement that formed a joint unit for development of the two leases. Beneath Section 18 are three natural gas zones, as explained by the district court:

> The Hosston (Travis Peak) Zone in the Sligo Field, Bossier Parish, Louisiana, was defined in the Louisiana Office of Conservation Order No. 8-B, effective September 1, 1956. That order, as amended and supplemented by the 8-B Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Hosston (Travis Peak) Zone in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as HOSS TP SUR comprised entirely of Section 18.
>
> The Cotton Valley "D" Zone in the Sligo Field, Bossier Parish, Louisiana, was defined in the Louisiana Office of Conservation Order No. 8-B, effective September 1, 1956. That order, as amended and supplemented by the 8-B Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Cotton Valley "D" Zone in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as CV D SUAA comprised entirely of Section 18.
>
> The Lower Cotton Valley Zone, Reservoir A, in the Sligo Field, Bossier Parish, Louisiana was defined in the Louisiana Office of Conservation Order No. 8-K, effective October 16, 1990. That order, as amended and supplemented by the 8-K Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Lower Cotton Valley Zone, Reservoir A, in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as LCV RA SUB comprised entirely of Section 18.

*EOG Res., Inc. v. Chesapeake La.,* No. 07-1246, 2009 WL 891891, at *1 (W.D. La. Mar. 31, 2009). The Operating Agreement covers and affects the parties' "gas and gas rights" in the first and second zones, but not the third. Chesapeake, which holds a 62.5 percent share of the zones, was named "Operator" of the Agreement, with authority to "manage, develop, and operate said leases" subject to the Operating Agreement. The Operating Agreement contains a provision requiring the Operator to obtain the consent of EOG, the Non-Operator, prior to drilling:

> No additional well shall be drilled by Operator for the Joint Account unless and until mutually agreed upon in writing by the parties hereto, and no expenditure shall be made by Operator as to any one project or item in excess of the sum of Five Thousand ($5000.00) without the written consent of the Non-Operator . . . .

The Operating Agreement defines "Joint Account" as "the combined interest of the parties" in the unit.

The Operating Agreement governed the parties' development of Section 18 for 50 years. In 2006, Chesapeake filed applications with the Louisiana Office of Conservation seeking to designate alternate unit wells for, among other units, the HOSS TP SUR, the CV D SUAA, and the LCV RA SUB. The Commissioner of Conservation held hearings on the proposed alternate wells in 2006. EOG did not attend the hearings despite receiving notice. After the hearings, the Commissioner issued several orders permitting the drilling of the alternate wells at issue. These orders were each "issued and promulgated by the Commissioner . . . as being reasonably necessary to conserve the natural resources of the State, to prevent waste . . . , to avoid the drilling of unnecessary wells, and otherwise to carry out" the laws of the State. The Commissioner found that it was "reasonable and in the interest of conservation to permit [Chesapeake] to drill, designate and utilize" the proposed alternate wells.  The Commissioner also

found that the wells were "necessary and in the interest of conservation" and would efficiently drain the relevant unit.

Meanwhile, Chesapeake sent three letters to EOG proposing to drill three alternate wells pursuant to the Operating Agreement: the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well. These wells were all located in Section 18 and were alternate wells slated to produce gas from all three of the zones described above. EOG never provided written consent for the three wells, but there is some indication in the record that employees of EOG raised objections on its behalf in conversations with Chesapeake representatives. On May 14, 2007, Chesapeake withdrew its proposals to drill the wells pursuant to the Operating Agreement and re-proposed drilling the wells in accordance with provisions of Title 30, Section 10 of the Louisiana Revised Statutes. EOG objected by letter in June 2007. Nonetheless, Chesapeake drilled and completed the three wells. All three were drilled to the depth of the Lower Cotton Valley zone and completed in the Hosston (Travis Peak) and Cotton Valley "D" zones.

Chesapeake suspended EOG's share of revenues from these new wells and offset EOG's portion of the drilling and completion costs. In addition, Chesapeake offset an additional 100 percent risk fee attributable to the wells and completion costs allocable to the Lower Cotton Valley Zone, Reservoir A, which is not subject to the Operating Agreement. This suit followed. EOG argues that its agreement to pay costs is limited by the provisions of the Operating Agreement, including the consent requirement, and that having breached this provision, Chesapeake cannot enforce its right to collect development costs. EOG seeks a declaratory judgment that Chesapeake breached the Operating Agreement and wrongfully withheld its 37.5 percent share of development proceeds. Chesapeake argues that it did not breach the Operating Agreement

and that EOG's suit constitutes an impermissible collateral attack on orders of the Commissioner of Conservation.

The district court deferred cross-motions for summary judgment and held a one-day bench trial. At the close of EOG's case, Chesapeake moved for and was granted a Judgment on Partial Findings pursuant to Rule 52(c). The district court issued a Memorandum Ruling containing findings of fact and conclusions of law, and this appeal followed.

## STANDARD OF REVIEW

On appeal of a judgment entered pursuant to Federal Rule of Civil Procedure 52(c), findings of fact are reviewed for clear error and conclusions of law *de novo*. *See Samson v. Apollo Res., Inc.*, 242 F.3d 629, 632-33 (5th Cir. 2001). The interpretation of a contract is a matter of law reviewed *de novo*. *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 651 (5th Cir. 1989). In this diversity case we apply Louisiana law.

## DISCUSSION

### A.    Collateral Attack

Louisiana Revised Statutes §§ 30:1 *et seq.* create a Commissioner of Conservation to prevent the waste of the State's oil and gas resources. The Commissioner has "authority over all persons and property necessary to enforce effectively the provisions of this Chapter and all other laws relating to the conservation of oil or gas." *Id.* § 30:4(A). Prior to drilling, a tract owner must obtain a determination from the Commissioner that a proposed well will not waste oil and gas reserves. *See Nunez v. Wainoco Oil & Gas Co.*, 488 So. 2d 955, 961 (La. 1986), *cert. denied*, 479 U.S. 925 (1986) (describing the Commissioner's powers). The Commissioner has specific powers to

> make such inquiries as he thinks proper to determine whether or not waste [of oil and gas] exists or is imminent . . . [and] the authority to collect data; to make investigations and inspections; to examine properties, leases, papers, books, and records; to

No. 09-30363

examine, survey, check, test, and gauge oil and gas wells, tanks, refineries, and modes of transportation; to hold hearings; to provide for the keeping of records and the making of reports; to require the submission of an emergency phone number by which the operator may be contacted in case of an emergency; and to take any action [to enforce his powers].

LA. REV. STAT. ANN. § 30:4(B). After notice and hearing, the Commissioner can issue a broad range of orders and regulations aimed at preventing waste. *Id.* § 30.4(C).

The Commissioner has the obligation to declare drilling units in oil and gas fields, *i.e.*, the maximum area that can be efficiently and economically drained by one well. *Id.* § 30:9(B). Wells may only be drilled within the drilling unit at the site designated by the Commissioner. *Id.* § 30:9(C). If more than one owner holds a mineral interest in a drilling unit, those owners may pool their resources to develop the unit, subject to the general power of the Commissioner to regulate extraction so as to prevent waste. *Id.* § 30:10(A). But when separate owners in a unit "have not agreed to pool their interests," after appropriate notice and hearing "the commissioner shall require them to do so . . . if he finds it to be necessary to prevent waste." *Id.* § 30:10(A)(1). Called "forced pooling," this action supersedes individual property rights to establish a common interest in the reservoir of natural resources beneath adjacent tracts. *Nunez*, 488 So. 2d at 963-64. Absent an agreement between tract owners allocating costs and proceeds, they are allocated by statutory formula permitting the developing party to recoup its expenses from other unit owners or, failing their prompt payment of expenses, to receive from the non-developing party a "risk fee" on top of drilling costs equal to 100 percent of those costs. LA. REV. STAT. ANN. § 30.10(A)(2)(b) (hereinafter the "Risk-Fee Statute").[1] However, the

---

[1] Since the time of the events giving rise to this suit, the statutory Risk Fee has been increased to 200 percent of development costs.

No. 09-30363

Commissioner's power of forced pooling and the statutory allocation of costs shall not "have the effect of enlarging, displacing, varying, altering, or in any way whatsoever modifying or changing the rights and obligations of the parties thereto under any contract between or among owners having a tract or tracts in the unit." *Id.*§ 30:10(A)(2)(g); *see also* Guy E. Wall, *Joint Oil and Gas Operations in Louisiana*, 53 LA. L. REV. 79, 90 (1992) (Risk Fee Statute "applies *in the absence of a contract* between owners having tracts in the unit" (emphasis added)).

Suits challenging an order of the Commissioner may only be brought in the state district court in East Baton Rouge Parish, where the Commissioner's office is located. LA. REV. STAT. ANN. § 30:12(A)(2). This rule is jurisdictional in nature, stripping other courts of the power to hear collateral attacks on the Commissioner's orders. *See, e.g.*, *Sanders v. Gary*, 657 So. 2d 1085, 1087 (La. Ct. App. 1995) (noting that the rule "vests exclusive jurisdiction to challenge the issuance of a drilling permit with the Nineteenth Judicial District Court for the Parish of East Baton Rouge"); *Phillips Petroleum Co. v. Batchelor*, 560 So.2d 461, 464 (La. Ct. App. 1990) (noting that the rule "is a jurisdictional provision"); *S. Natural Gas Co. v. Poland*, 406 So. 2d 657, 661 (La. Ct. App. 1981) ("The legislature simply has not given . . . this court the jurisdictional authority to adjudge invalid an order of the Commissioner of Conservation."); *Brown v. Alice-Sidney Oil Co.*, 343 So.2d 745, 748 (La. Ct. App. 1977) (noting that the rule is "jurisdictional in nature"); *Vincent v. Hunt*, 221 So.2d 577, 582 (La. Ct. App. 1969) (noting that East Baton Rouge Parish is the nonwaivable "'jurisdictional' venue" in suits attacking Commissioner's orders). The rule against collateral attacks is not limited to suits seeking a judgment that would "directly affect actual enforcement of, or compliance with, the Commissioner's order," but extends broadly to "suits between private parties in which a particular order of the Commissioner is an operative fact upon which the determination of the

7

parties' respective rights directly depends." *Trahan v. Superior Oil Co.*, 700 F.2d 1004, 1005 (5th Cir. 1983).

Chesapeake argues that, regardless of whether it breached the Operating Agreement (which it denies), EOG's suit is an impermissible collateral attack on the Commissioner's orders permitting drilling. Courts have considered several factors in determining whether a suit brought in a venue other than that prescribed by § 30:12(A)(2) challenges an "operative fact" of the Commissioner's order such that it is an impermissible collateral attack:

1. Does the plaintiff seek relief that would require the defendant to violate the Commissioner's order? *Trahan*, 700 F.2d at 1015-16; *c.f. United Gas Pipe Line Co. v. Watson Oil Corp.*, 306 So. 2d 731, 736 (La. 1975) (the Commissioner's orders supersede contractual duties when the contract requires action or inaction offensive to the Commissioner's order).

2. Would resolution of the claim require the court to reconsider the Commissioner's factual findings? *See Trahan*, 700 F.2d at 1016-17 (citing *Savoy v. Tidewater Oil Co.*, 218 F. Supp. 607 (W.D. La. 1963) (finding a collateral attack where challenge implicated Commissioner's findings of geological facts); *Mayer v. Tidewater Oil Co.*, 218 F. Supp. 611 (W.D. La. 1963) (same)).

3. Would the Commissioner have had the authority to grant the relief requested by plaintiff if the claim had been presented at the hearing? *See Trahan*, 700 F.2d at 1019 (citing *Pierce v. Goldking Props., Inc.*, 396 So. 2d 528, 534-35 (La. Ct. App. 1981) (finding a collateral attack where the relief sought could have been granted by the Commissioner)).

We hold that EOG's suit does not challenge an "operative fact" of the Commissioner's orders and thus is not a collateral attack on them. First, EOG does not seek relief that would require Chesapeake to violate the Commissioner's orders. The orders give "permission to drill" and the Commissioner found that it would be "reasonable and in the interest of conservation to permit" the drilling of alternate well sites. These orders were permissive, not compulsory—they

allowed but did not require Chesapeake to drill the proposed wells. The use of the word "necessary" in the orders is not to the contrary; there is no clause that would subject Chesapeake to any penalty for *not* drilling the wells. Nor were the orders an exercise of the Commissioner's "forced pooling" power, which was unnecessary because EOG and Chesapeake had previously agreed to pool their resources to develop the unit by executing the Operating Agreement. *See Alexander v. Holt*, 116 So. 2d 532, 534-36 (La. Ct. App. 1959) (distinguishing between orders that permit drilling and those that compel pooling). In any event, whether the Commissioner's orders required or merely permitted drilling, EOG does not ask the court to enjoin Chesapeake from further operation of the wells. Rather, EOG seeks an accounting of the proceeds of the wells pursuant to the Operating Agreement, without deduction for Chesapeake's well expenses or application of the Risk Fee Statute.[2]

Second, EOG does not challenge any of the Commissioner's factual findings.

Third, the Commissioner would have been without power to grant the relief requested by EOG: an accounting of the proceeds of the wells. The Commissioner has the power to allocate development and production costs among tract owners in a unit, but only after he has exercised his power of forced pooling, which was not the case here. LA. REV. STAT. ANN. § 30:10(A)(2)(b).

---

[2] In its Memorandum Ruling, the district court stated: "EOG maintains that it did not consent to the drilling of the wells under the Operating Agreement because the wells were unnecessary and would be drilled too close to already existing wells. Such a contention is in direct conflict with the orders of the Commissioner, and constitutes an impermissible collateral attack." *EOG Res.*, 2009 WL 891891, at *8 (citations omitted). For this proposition, the district court cited the factual history recounted in EOG's summary judgment motion. In the same motion, however, EOG noted that it did not "challenge any order of the Commissioner—neither the orders approving the units nor the orders approving the wells in question." Its prayer for relief sought an accounting of the proceeds of the well and a declaration that, because Chesapeake breached the Operating Agreement, it was not entitled to recoup its drilling costs. In neither its summary judgment motion nor at trial did EOG seek to block drilling.

Otherwise, the Commissioner has no power to "enlarg[e], displac[e], vary[], alter[], or in any way whatsoever modify[] or chang[e] the rights and obligations of the parties." *Id.* § 30:10(A)(2)(g); *see also Magnolia Coal Terminal v. Phillips Oil Co.*, 576 So. 2d 475, 484 (La. 1991) ("Breach of a contractual obligation . . . is not within the jurisdiction of the commissioner of conservation."); *United Gas Pipe Line Co.*, 306 So. 2d at 736; *Superior Oil Co. v. Humble Oil & Refining Co.*, 241 So. 2d 911, 912 (La. 1970) ("[T]his is, thus, a contract dispute pure and simple which the Commissioner cannot resolve. . . ."); *Monsanto Chem. Co. v. S. Natural Gas Co.*, 102 So. 2d 223, 225 (La. 1958) ("It would be beyond the function and powers of the Commissioner to say whether or not alleged contractual rights . . . were recast and affected by the order. That is clearly a function of the courts.").

This holding is not contrary to the Louisiana Supreme Court's landmark *Nunez* case, which the district court cited extensively. In *Nunez*, the court held that the Commissioner's unitization power superseded traditional subsurface property rights. 488 So. 2d at 962. Accordingly, an operator did not trespass when its well crossed the subsurface boundary onto the plaintiff's property, which was part of the drilling unit. The court rejected the plaintiff's demand for an injunction ordering the operator to remove the well. *Id.* at 964. In so ruling, the court observed that "[u]nitization . . . creates rights and interests in a pool of hydrocarbons beyond the traditional property lines [and] effectively amends . . . private property laws." *Id.* at 963. In this case, EOG does not seek to vindicate a property right, but rather a contractual right that the Commissioner is without power to modify. LA. REV. STAT. ANN. § 30:10(A)(2)(g).

Considering the foregoing, we reverse the judgment of the district court that this suit is a collateral attack on the orders of the Commissioner of Conservation.

No. 09-30363

## B.    Breach of Contract

Because § 30:12(A)(2) is jurisdictional in nature, the district court should have dismissed the case for lack of jurisdiction upon finding that the suit was a collateral attack. However, the district court did go on to make findings as to breach of contract that we construe as an alternative basis for its decision.

First, the district court found that Chesapeake "did not breach the Operating Agreement because the wells were drilled for the purpose of reaching the Lower Cotton Valley Zone, Reservoir A," which zone was not covered by the Operating Agreement. *EOG Res.*, 2009 WL 891891 at *8. It stated: "There is no contractual agreement between the parties with respect to this formation. Without a contractual agreement, there can be no breach thereof." *Id.* Second, the district court acknowledged EOG's argument that "the wells were completed in the two zones subject to the Operating Agreement." *Id.* at *9. However, the district court rejected the argument that this completion in the two covered zones breached the Operating Agreement, since such completion was "found to be necessary and in the interest of conservation by the Commissioner," and thus the suit was an impermissible collateral attack. *Id.*

We have reversed the district court's finding that the suit was a collateral attack, and any finding that is predicated thereupon likewise cannot survive. Accordingly, we vacate the finding that there was no breach of contract and remand to the district court to determine the respective claims of the parties in the first instance.

### CONCLUSION

Considering the foregoing, we reverse the judgment of the district court that the suit was a collateral attack, vacate the finding that there was no breach of contract, and remand for further proceedings consistent with this opinion. Appellant's motion for leave to file a sur-reply is denied as moot.

11