# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**F I L E D**
April 28, 2011

No. 10-30475

WILLIAM HENRY SANDERS

Plaintiff-Appellant

v.

BELLE EXPLORATION, INCORPORATED

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Louisiana
(1:07-CV-1108)

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

William Sanders appeals from the district court's entry of judgment following a bench trial in favor of Belle Exploration, Inc., ("Belle") on Sanders's Louisiana state law claims against Belle for breach of a mineral lease agreement between them. Broadly, Sanders's arguments on appeal are (1) that the district court erroneously determined the boundaries of Sanders's property subject to the lease at issue; (2) that the district court's decision was an unconstitutional taking of Sanders's property; and (3) that the district court committed an error

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30475

of law in concluding that an order of the Louisiana Commissioner of Conservation superseded certain pooling provisions in the mineral lease.

We affirm.

I.

Sanders owns lands and mineral interests in Sections 25 and 30 of La Salle Parish, Louisiana. On July 1, 2000, Sanders and his wife, Bessie Otwell Sanders, along with Ricky and Dana Shirley, executed an Oil, Gas and Mineral Lease (the "Lease") in favor of Belle applicable to all of the lessors' lands and mineral interests in Sections 25 and 40 (the "Leased Lands"). Under the Lease, the lessors retained a one-fifth royalty interest in any mineral production from the Leased Lands.

In 2002, the Louisiana State Mineral Board (the "Mineral Board") passed two resolutions concerning the land at issue here. The resolutions conceded to private ownership of mineral rights in all lands above the thirty-six foot mean sea level contour in certain parcels in the vicinity of Catahoula Lake, including some of the Leased Lands.[1] At nearly the same time, the Louisiana Commissioner of Conservation (the "Commissioner") ordered the forced pooling and unitization of property including the Leased Lands, resulting in the creation of numbered sand units ("SU") 116 through 122. This case concerns SU 117 and SU 118. SU 117 includes portions of the Leased Lands adjacent to Catahoula Lake; SU 118 does not.

Under the terms of the Lease, Belle has the power to combine or pool all or part of the Leased Lands with other lands in which Belle has an interest. The Lease obligates Belle to include a minimum of twenty acres of the Leased Lands

---

[1] As set out in our discussion of the merits of Issue (1) of this appeal, the State of Louisiana owns all land and mineral rights up to the ordinary high water mark of a navigable lake such as Catahoula Lake. Sanders's private property interests in the Leased Lands thus begin at this boundary.

2

No. 10-30475

in each operating unit formed by pooling.    SU 118, as created by the Commissioner, only contains approximately four acres of the Leased Lands.

Sanders filed this suit in state court and Belle removed it to federal court. As relevant on appeal, Sanders contended that (1) Belle owed him additional royalties with respect to SU 117 because Belle had improperly determined the boundary between Sanders's property and that of the State of Louisiana in and around Catahoula Lake, resulting in underrepresentation of Sanders's interest in SU 117, and (2) Belle breached the Lease by failing to pay Sanders royalties from SU 118 as though SU 118 included twenty acres of the Leased Lands.

The district court conducted a three-day bench trial and entered judgment in favor of Belle on the issues relevant to this appeal.   Sanders timely appealed.

## II.

"Our standard of review for bench trials is well established: findings of fact are reviewed for clear error; legal issues, *de novo.*" *Seal v. Knorpp*, 957 F.2d 1230, 1234 (5th Cir. 1992).   The clear error standard requires us to defer to the power of the district court to determine facts; the

> standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently . . . . If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.   Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).   In this diversity case, we apply the substantive law of the forum state, Louisiana, "in an attempt to rule as a Louisiana court would if presented with the same issues."   *See Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 563 (5th Cir. 2000) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79-80 (1938)).

No. 10-30475

### III.

On appeal, Sanders asserts three grounds of error with respect to two operating units, SU 117 and SU 118. First, Sanders contends that the boundary between his and the State of Louisiana's interest in SU 117 should be determined by reference to a survey he ordered in 2001 (the "Tooke Survey"), whereas the district court agreed with Belle that the proper reference is a survey conducted under the auspices of the Louisiana Department of Public Works in 1942 (the "Heard and Daigre Survey"). Second, Sanders argues that the district court's decision to rely on the Heard and Daigre Survey was an unconstitutional taking of his property in SU 117. Third, Sanders takes the position that Belle's payment of royalties in proportion to the actual acreage of the Leased Lands included in SU 118, a compulsory unit created by the Commission that included fewer than twenty acres of the leased lands, breached Belle's obligation under the Lease to include twenty acres of the Leased Lands in any pooled unit.

A.     SU 117

1.     Determination of Boundary

The dispute between the parties over the extent of Sanders's interest in SU 117 stems from Louisiana law governing the ownership of land surrounding a navigable lake.[2] "[T]he State of Louisiana upon its admission to the Union acquired title to all lands within its boundaries below the ordinary high-water mark of navigable bodies of water . . . . As to lakes, the State has never ceded, and still holds, the land below the ordinary high-water mark." *State v. Placid Oil Co.*, 300 So. 2d 154, 172 (La. 1974). The State has also determined by statute not to recognize any right to alluvion or dereliction on the shores of lakes.[3] LA. CIV. CODE ANN. art. 500 (2010); *see also Placid Oil*, 300 So. 2d at

---

[2] The parties agree that Catahoula Lake is a navigable lake.

[3] "Alluvion" is the expansion of the shoreline over time by the deposit of sediment, whereas "dereliction" is the expansion of the shoreline by the receding of water. LA. CIV. CODE

173 ("As to lakes, the adjacent landowners have no alluvial rights.").  The effect of these rules on this case is that the State of Louisiana holds title to all land that was below the ordinary high-water mark of Catahoula Lake in 1812, when Louisiana joined the Union, and Sanders holds title to the land above that mark. *See Sanders v. State*, 973 So. 2d 879, 883 (La. Ct. App. 2007) ("No one disputes that it is the ordinary high water level as it existed in 1812 in Catahoula Lake that determines the extent of the State's ownership.").

The parties are further in agreement that the ordinary high water level of Catahoula Lake in 1812 is thirty-six feet above mean sea level ("MSL").  They disagree, however, about how to fix that point, relying on two different surveys. Belle points to the 1942 Heard and Daigre Survey and Sanders points to the 2001 Tooke Survey.  The Heard and Daigre Survey represented the State's effort to assess where the high water mark of Catahoula Lake would have been in 1812, but it appears to have been conducted as a meander survey.  A meander survey determines the approximate location of the lake and plots the sinuosities of the shoreline, but generally does not set the boundary between private and public ownership unless expressly provided for in a conveyance.  *Sanders*, 973 So. 2d at 884.  The Tooke Survey locates the true thirty-six foot MSL contour line, but only as it lay in 2001.  The competing surveys were placed in evidence before the district court, which ultimately agreed with Belle that the Heard and Daigre Survey more properly established the boundary line between the State's and Sanders's land than the Tooke Survey.

The district court offered two independent bases for its decision: first, the Louisiana Third Circuit Court of Appeal's decision in a related case,[4] and,

---

ANN. art. 499 (2010).

[4] In *Sanders v. State*, 973 So.2d 879, the Louisiana Court of Appeals for the Third Circuit reversed a possessory judgment in favor of Sanders and against the State of Louisiana as to the lands between the thirty and one-tenth feet MSL and thirty-six feet MSL. *Id.* at 880.

No. 10-30475

second, the court's independent assessment of the evidence introduced at trial. Rather than wade into the state law question of the preclusive effect of *Sanders*, we examine the second basis for the district court's decision and conclude that Sanders is unable to show that the district court's reliance on the Heard and Daigre Survey was clearly erroneous.

Sanders and Belle agree that the ultimate question put to the district court required the district court to locate the thirty-six foot MSL contour line as it existed in 1812. The district court was faced with two imperfect pieces of evidence on the question: the thirty-six foot MSL contour line as it existed in 2001, reflected in the Tooke Survey, and the thirty-six foot MSL meander line as the State's surveyors concluded it probably existed in 1812, reflected in the 1942 Heard and Daigre Survey. Sanders may be correct that the Heard and Daigre Survey did not definitively establish the proper boundary because it is a meander line. *See, e.g., Bd. of Comm'rs v. Rathborne Land Co.*, 868 So. 2d 928, 931 (La. Ct. App. 2004) ("In general, meanders are not to be treated as boundaries . . . ."). However, a contour survey conducted 189 years after the fact, as the Tooke Survey was, also does not establish definitively where those contours lay in 1812. Both surveys were relevant and probative evidence,[5] but neither was conclusive evidence. After a full trial, the district court determined

---

The Louisiana court held that "the ordinary high water mark [of Catahoula Lake] in 1812 was 36 feet MSL as surveyed by Heard and Daigre in 1942." *Id.* at 887.

[5] Sanders argues that the district court should not have admitted the Heard and Daigre Survey as evidence of Sanders's property line, but this argument is simply an extension of his position that the district court could not rely on the Heard and Daigre Survey to establish a property line as a matter of law. Sanders otherwise concedes the Heard and Daigre Survey's admissibility in general. We observe no abuse of discretion by the district court in treating this survey as relevant evidence. *See Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 180 (5th Cir. 1995) ("Because of his or her involvement in the trial, a district court judge often has superior knowledge and understanding of the probative value of evidence. Therefore, we show considerable deference to the district court's evidentiary rulings, reviewing them only for abuse of discretion.").

that the Heard and Daigre Survey line was likely more accurate. We are unwilling to hold that Sanders has demonstrated that the district court's choice between two proposed boundaries meets the high standard of clear error. *See Anderson*, 470 U.S. at 574.

   2.   Judicial Taking

Sanders also argues that the district court's decision to treat the Heard and Daigre Survey as establishing the proper boundary was an unconstitutional taking and can be reversed on this basis alone. Whatever the merits of this argument, it was never made to the district court, and we therefore decline to entertain it on appeal. *See LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal.").

B.   SU 118

A different legal issue is presented by the situation affecting SU 118. Sanders contends that Belle is liable to him for damages resulting from the fact that SU 118 includes fewer than twenty acres of the Leased Lands in violation of the Lease. The parties agree that the Commissioner ordered the creation of SU 118 pursuant to its statutory powers and directed the inclusion of approximately four acres of the Leased Lands in that unit. Belle argues that this compulsory pooling and unitization order controls the distribution of proceeds of production from the unit and therefore its payment of royalties to Sanders on the basis of the actual acreage of Leased Lands therein, rather than the twenty acres Sanders argues for.

   We begin by observing that the precedents of this court and of the Louisiana Supreme Court establish conclusively that (1) a party may not collaterally attack an order of the Commissioner in federal court but must abide by the procedures for direct state review, *see Trahan v. Superior Oil Co.*, 700 F.2d 1004, 1015-16 (5th Cir. 1983); (2) for this reason, in collateral proceedings,

private contracts must yield to orders of the Commissioner, but "only if there is a conflict," *see, e.g., United Gas Pipe Line Co. v. Watson Oil Corp.*, 306 So.2d 731, 736 (La. 1975); and (3) inversely, when there is no direct conflict, private contracts remain enforceable, *see, e.g., EOG Res., Inc. v. Chesapeake Energy Corp.*, 605 F.3d 260, 267 (5th Cir. 2010); *Monsanto Chem. Co. v. S. Natural Gas Co.,* 102 So.2d 223, 225-26 (La. 1958). Neither party contests these points of law. The issue is simply whether the Commissioner's orders of compulsory pooling and unitization of the Leased Lands "conflict" with the Lease or not.

In assessing whether there is a conflict such that Sanders's argument must be viewed as an impermissible collateral attack, we have identified three factors to assess:

1.   Does the plaintiff seek relief that would require the defendant to violate the Commissioner's order?

2.   Would resolution of the claim require the court to reconsider the Commissioner's factual findings?

3.   Would the Commissioner have had the authority to grant the relief requested by plaintiff if the claim had been presented at the hearing?

*EOG Res., Inc.*, 605 F.3d at 266 (internal citations omitted).

The operative provisions of the Commissioner's order directed the creation of "SU 116 through SU 122, as more particularly shown on the plat" attached and further directed that

> [t]he separately owned tracts, mineral leases and other property interests within the units created are hereby pooled, consolidated, and integrated in accordance with Section 10, Title 30 of the Louisiana Revised Statutes . . . , with each tract sharing in unit production in proportion that the surface area of each tract bears to the entire surface area of the unit in which it is situated.

As agreed at trial, the attached plat reflected that SU 118 contained fewer than twenty acres of the Leased Lands.  The disputed provision of the Lease reads simply: "In the event of pooling each unit must contain a minimum of 20 acres of the [Leased Lands] unless Lessee receives prior written consent from Lessor." However, the Lease further provides that, in the event of pooling, the royalties paid shall be in the proportion that "the number of acres . . . out of this lease placed in any such operating unit . . . bears to the total number of acres included in such operating unit. . . ."

The district court correctly concluded that the Lease provision requiring the inclusion of twenty acres in any pooled unit directly conflicts with the Commissioner's order that SU 118 includes approximately four acres of the Leased Lands.  Sanders concedes that he could not obtain an injunction to require Belle to include twenty acres of the Leased Lands in SU 118 - that relief would clearly "require the defendant to violate the Commissioner's order," *see EOG Res., Inc.,* 605 F.3d at 266 – but he argues that his right to recover damages against Belle for breach of contract survives the Commissioner's unitization order.  In so arguing, Sanders attempts to transform Belle's obligation under the Lease to include minimum acreage in a pooled unit into an obligation to pay royalties as though the required acreage were included in the unit, i.e., an independent contractual obligation.

As the district court observed, courts have routinely treated as independent contractual obligations a variety of agreements to pay royalties, *see, e.g., Dillon v. Holcomb*, 110 F.2d 610, 611 (5th Cir. 1940), and to allocate costs, *see, e.g., Monsanto Chem. Co.*, 102 So. 2d at 224.  The reason these types of agreements are not superseded by a pooling and unitization order, however, is that they can be given full force and effect without undermining the Commissioner's order.  In *Southwest Gas Producing Co. v. Creslenn Oil Co.*, 181 So. 2d 63, 65 (La. Ct. App. 1966), for example, the parties all agreed to divide the

costs and proceeds of mineral exploration and production from a certain area in fixed percentages. A subsequent order by the Commissioner allocated field production to certain smaller tracts within the contract area. The court held that the unit order did not conflict with the parties' private contractual rights to share production and costs from the unit in different ratios. A contrasting result occurred in *Humble Oil Refining Co. v. Jones,* 125 So.2d 640 (La. Ct. App. 1960). In *Humble*, the parties formed a voluntary pool consisting of 160 acres, with the defendant holding 46.73 of the total acres. *Id.* at 642. After a producing well was drilled on the defendant's tract, the Commissioner formed a compulsory unit consisting of 177.60 acres. The Commissioner's unit included all 46.73 acres owned by the defendant but not all of the other acreage that had been included in the voluntary pool. The plaintiffs argued that the contractual voluntary unit controlled the distribution of royalties between the parties to that unit. *Id.* at 644. The defendant, whose sharing ratio was greater under the Commissioner's unit, argued that the Commissioner's unit should control the allocation of production and sharing of royalties. The Louisiana court stated, "the parties should not be presumed to have agreed to share their interest on the old declared unit unless they show a specific and positive intention to freeze the old unit." *Id.* at 646. Because no provision in the lease in *Humble Oil* indicated an intent by the lessor to freeze his royalty interest upon the formation of the voluntary unit, the Commissioner's order superseded the parties' contract. *Id.* at 647

The Lease in this case does not reflect an agreement by the Lessee to freeze his obligation to pay royalties to the lessor based on the minimum acreage requirement. Although the minimum acreage provision reflects the Lessee's agreement to include a minimum acreage in any unit, the royalty provision of the Lease indicated that royalties are to be paid from production allocated to the Lease based on the actual acreage included in any unit. The minimum acreage provision on which Sanders relies cannot be enforced without coming into direct

No. 10-30475

conflict with the core of the Commissioner's order. Further, the royalty provision that more directly governs the issue in this case is consistent with the Commissioner's order.

As for Sanders's argument that his request for damages avoids his problem, we emphasized in *Trahan* that

> The application of this rule prohibiting "collateral attack" of an order of the Commissioner is not limited to suits in which the judgment will directly affect actual enforcement of, or compliance with, the Commissioner's order, such as suits by or against the Commissioner, or suits between private parties for injunctive relief requiring of one party conduct or inaction which will, in fact, violate an order of the Commissioner. Rather, the rule also extends to suits between private parties in which a particular order of the Commissioner is an operative fact upon which the determination of the parties' respective rights directly depends, *even though all relief sought can be given, such as by money damages . . .* , without thereby causing any actual violation of the Commissioner's order.

*Trahan*, 700 F.2d at 1015-16 (emphasis added). Thus the distinction urged by Sanders is expressly rejected by our precedent. The breach asserted in this case, including less than twenty acres in a pooled unit, was precisely compelled by the Commissioner's order. Similarly, the contrary conduct that Sanders urges the Lease requires, including at least twenty acres in the Commissioner's unit, could not be ordered by the Commissioner had Sanders sought direct review. Thus there is a conflict between the Commissioner's unitization order and the pooling requirement making Sanders's suit for damages as to SU 118 an impermissible collateral attack. We therefore hold that the district court correctly deferred to the Commissioner's order. Sanders is not entitled to recover damages on his claim of breach of the Lease Agreement as to SU 118.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.